John Jacob BRAM, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15062.

United States Court of Appeals
Eighth Circuit.

Nov. 9, 1955.

William E. Crowder, Minneapolis, Minn., for appellant.

George E. MacKinnon, U. S. Atty., and Kenneth G. Owens, Asst. U. S. Atty., St. Paul, Minn., for appellee.

Before WOODROUGH, JOHNSEN and VOGEL, Circuit Judges.

WOODROUGH, Circuit Judge.

Appellant was convicted of robbing the State Bank of Danvers, Danvers, Minnesota (insured by Federal Deposit Insurance Corporation) on October 13, 1953, in violation of 18 U.S.C. § 2113(a) and (d) and was sentenced to 25 years imprisonment.

The chief witness for the government was one Howard Milton Mason, Jr., who admittedly participated in the bank robbery, and was under indictment for that offense at the time of the separate trial of appellant. Mason was also under indictment in Wisconsin for burglary at the time of the trial and had a criminal record as was shown. The appellant did not take the witness stand in his own defense nor introduce evidence of good character. On this appeal he does not challenge the sufficiency of the evidence to support the verdict and judgment against him.

The grounds relied on by appellant for reversal are (1) that the court erred in receiving inadmissible, prejudicial evidence; (2) that the court erred in permitting certain improper cross examination of witnesses called to prove an alibi; (3) that the court committed reversible error in summarizing the evidence to the jury.

Before discussing the grounds for reversal, an outline of the evidence may be summarized as follows.

There was substantial evidence to establish that on October 13, 1953, at about 1:50 P.M., two men entered the State Bank of Danvers, Minnesota and through the use of an automatic pistol took away money and property (unissued travelers checks) in the amount of $11,-911.50. They forced three employees of the bank and two customers to lie on the floor, and before leaving the bank, compelled the employees and customers to enter the small bank vault and locked them in. Both robbers wore business suits and hats; the larger of the two, who held the pistol, wore a hankerchief over his face below his eyes and was close to six feet in height and weighed about 190 pounds. The smaller man wore a rubber mask or "devil face mask" over his face, had dark eyes, was about five feet eight or nine inches in height and weighed about 160 to 175 pounds. The larger man was admittedly Howard Milton Mason, Jr.

Mason testified for the prosecution that he and appellant John Bram first met in 1940 at the St. Cloud Reformatory where they were both doing time together and were friends and social acquaintances since that time. Some time prior to October, 1953, Mason himself was in great need of money and he said that Bram was behind on certain payments he was required to make by an order in bastardy proceedings to a girl named Marlys Rogers. Bram suggested robbing the bank at Danvers which was in an area with which he was

acquainted, being near the Bram farm where Bram's mother lived.

Mason testified that on Thursday, October 8, 1953, he and Bram went from Minneapolis to Danvers in a Lincoln car belonging to and driven by Bram to survey the situation as to the bank and plan a method of robbery and escape to be carried out at some subsequent date.

They planned to steal a car from the Hansford Pontiac lot in Minneapolis for use in the robbery and to leave Bram's Lincoln car near a bridge and grove of trees close to the Bram farm until after the robbery. The proceeds of the robbery were to be transferred from the car used in the robbery to the Lincoln car and then hidden in a haystack in the meadow near the Bram farm.

After making the reconnaissance of the bank and planning the robbery, Bram and Mason returned to Minneapolis but on the way stopped at Kerkhoven, Minnesota, where Bram made a telephone call to Minneapolis to Marlys Rogers. He assured her he was soon going to pay up back payments due her.

Bram's work record showed that he was absent from his employment on October 8, 1953 (the date of the reconnaissance), and also showed that he worked on the 9th of October, a Friday.

Mason testified that on Saturday, October 10, 1953, he and Bram went to a Kresge store in Minneapolis and purchased two rubber "devil" masks and two sets of rubber gloves. The clerk who made the sale identified both Bram and Mason as the purchasers. In the afternoon of October 10, Mason stated they went to a gravel pit on the outskirts of Minneapolis and tried out the gun to be used in the robbery which gun Bram had obtained from his sister. The gun had a tendency to jam but both agreed it would serve the purpose.

Mason also testified that on Sunday, October 11, he and Bram drove in Bram's Lincoln automobile to Cannon Falls, Minnesota, where they stole a set of 1953 Minnesota license plates from a Ford car

and returned to Minneapolis having agreed that Mason would drive his 1952 Dodge truck to the Bram farm and leave it there.

On Monday, October 12, Bram worked at his place of employment and Mason started to drive his truck towards the Bram farm, leaving Minneapolis about 11:40 a. m. The truck broke down and got only as far as Willmar, Minnesota, where Mason left it and started to hitch hike back to Minneapolis, to meet Bram at his place of residence at 18th Street and Second Avenue in Minneapolis as they had previously agreed. At Delano, Minnesota, Mason tried to reach Bram on the telephone several times but was unsuccessful. He then hired one Loren Yaeger to take him to Minneapolis in Yaeger's car and after arriving in Minneapolis, Yaeger at Mason's direction drove to Bram's residence. Yaeger in his testimony confirmed this portion of Mason's testimony and testified as to the street number of the residence where Mason got out of the car, which street number was in fact Bram's residence.

Later that evening about 9 p. m., Mason joined Bram and they drove together to the Hansford Pontiac lot in Minneapolis where Mason stole a 1952 powder blue Pontiac car and at a place a block away, they removed the license plates and substituted the plates previously stolen off the Ford car at Cannon Falls.

Mason then drove the Pontiac and Bram his Lincoln car to the hayfield on the Bram farm where they parked the Pontiac and the two then drove to Willmar. There Mason picked up his truck and they both then returned to the hayfield. They slept there in Bram's Lincoln until the morning of October 13th.

On the morning of Tuesday, October 13, Mason drove the Pontiac car and Bram drove his Lincoln car to the previously arranged point and there the Lincoln was parked. Bram left a change of clothing on the back seat of the Lincoln which was observed by a witness.

Mason testified that they had enlarged the eye holes in the masks previously

purchased and that Bram's fit and he later wore it during the robbery, but Mason's did not fit and he discarded it for a handkerchief. Mason stated that they both drove in the stolen Pontiac to Danvers but did not stop as they considered there were too many people around the bank and when they returned a second time around noon, they found the bank closed. In driving around they ran low on gas and stopped to buy some at a station west of Danvers. Both were short of funds so Mason left his watch as security. At that time the license plates stolen from the Ford were on the Pontiac and the numbers were written down by the woman who sold them the gasoline. At about 2:00 p. m. they entered the bank and committed the robbery.

After leaving the bank, Mason stated that he drove the Pontiac along the pre-arranged route to where the Lincoln was parked and there the proceeds of the robbery were transferred to the Lincoln car and the license plates removed from the Pontiac and placed inside the Lincoln. The Pontiac was abandoned at this spot. They both drove in the Lincoln to the hayfield where the loot was cached in a haystack. They changed clothes and left. Mason soon thereafter started to drive off in his truck and stated that as he was leaving, Mrs. Bram, John's mother, and her hired man Rogers came driving by and they stopped and talked with Mason. After the conversation, Mason returned to Minneapolis.

Bram's work record showed that he was absent from his employment all day on Tuesday, October 13, 1953, but was back at work on Wednesday the 14th. A fellow employee testified that Bram was off work on the 13th of October and on the next day told him that he, Bram had been duck hunting up by Benson which is only a few miles from Danvers. On the evening of the 14th, Mason and Bram met after a telephone call and drove in Mason's truck to the haystack, picked up the proceeds of the robbery and returned to Minneapolis. Mason said they threw the money bags into a small creek

and they were later recovered there. At Minneapolis, according to Mason, the proceeds of the robbery were transferred to Bram's Lincoln car and on the morning of October 15th the two men drove outside of Minneapolis and into a field where they burned the money wrappers (remnants of which were recovered) and divided the proceeds consisting of money and travelers checks. Bram then drove Mason back to Minneapolis.

Bram's work record showed that he was absent from his employment on the morning of October 15, 1953, but worked that afternoon.

A short time later Mason was picked up on suspicion by F.B.I. agents and released and then called by the F.B.I. After this call, Mason stated he and Bram met again and they agreed that if Mason were taken into custody, Bram would pick up Mason's 1940 Chevrolet at a designated place and that Mason would have the keys hidden in the tail pipe of the car. Mason stated that Bram followed him to observe where the car would be left. Mason parked the car, left Bram, met the F.B.I. agents and was then taken into custody. After Mason was apprehended, Bram, who was kept under surveillance by the F.B.I. agents, was followed by two of the agents who saw him on October 27th drive to the spot where Mason's Chevrolet was parked; saw him go to the rear of the car where Mason testified he had left the car keys, then get in the car, start it up and drive off. Subsequent to the robbery Bram changed the color of his hair so that at the time of trial it was less gray than formerly. He had a full head of hair and never wore a hat.

The government presented several witnesses in corroboration of testimony given by Mason.

Witness Jacobson testified he saw Bram's Lincoln car at the place testified to by Mason on the road near Danvers and he observed clothing on the back seat and thereafter identified the same car. Herbert and Mattie Schwanke testified they observed a truck and a car back of

the haystack in the Bram hay meadow on the morning and day of the robbery; that they saw a blue car come from the east and drive to the Bram farm on the day of the robbery. Witness Lyon Lindman testified he saw a green Lincoln or Mercury parked at the bridge near the hay meadow on the day of the robbery. The clerk in the Kresge notion store identified Bram and Mason as the ones who purchased two devil face masks. Bram's work record, as evidenced by his time cards, completely dovetailed with Mason's testimony as to the times of their joint activities. The records of the telephone company showed a long distance toll ticket from John "Brown" to Mrs. Marlys Rogers on October 8, 1953, the call being made from Kerkhoven, Minnesota to Minneapolis, Minnesota. A telephone operator testified that phone calls were placed to the defendant on October 12, 1953, from Delano, Minnesota, as testified by Mason. Certain of defendant's witnesses testified that they saw defendant in Minneapolis on the day of the robbery but the witness Jenkins, a fellow employee, testified that the defendant was off work on the 13th day of October, the day of the robbery, and on the next day said he (Bram) had been up by "Benson hunting". Benson is only a few miles from Danvers. Rogers, the hired man on the Bram farm, testified on the stand that he had not seen Mason near the hay meadow on the day of the robbery as claimed by Mason. The government was allowed, under proper admonition and instructions by the court, to impeach the testimony of Rogers by means of a signed statement taken from him a short time after the robbery in which Rogers stated that he had seen Mason at the place and on the day testified to by Mason.

The defendant adduced testimony to establish an alibi and several witnesses testified that they had seen and talked with him in Minneapolis, 134 miles from Danvers, on the day of the robbery.

The testimony which the appellant contends was erroneously received by the court to his prejudice was

(1) testimony by the witness Mason to the effect that he first met the defendant in the St. Cloud Reformatory where he (Mason) was "doing time" for car theft and where they were both "doing time" together and palled around together.

(2) testimony by Mason to the effect that defendant Bram conversed with him on many occasions about his (Bram's) relations with Marlys Rogers stating that he was going with her steady, that she had borne him a son and had filed bastardy proceedings against him and been awarded $25 a month payments to support the child and he felt obligated to support her.

(3) testimony by the witness Charles Walburg to the effect that he had occasion in November of 1953 as an employee of the police department of Minneapolis to take and record a description of defendant in connection with an arrest or apprehension of him regarding an offense on October 30, 1953. (No objection was made to this testimony of Walburg on the trial.) The record shows that after discussion at the bench, the parties stipulated that if he testified further, Walburg would testify that Bram was five feet nine inches in height; that he weighed 173 pounds; that he had dark, chestnut, wavy hair and his eyes were medium chestnut.

Appellant's contention is that the testimony received in each of these instances indicated wrongful conduct on his part unrelated to the charge for which he was on trial and therefore reflected on his character; that his character was not in issue as he neither took the stand as a witness nor offered evidence of good character. He relies on the rule of law that conviction of one offense may not be obtained or supported by evidence of the commission by the accused of other unrelated offenses and that evidence of the commission of other unrelated offenses may not be received to prove bad character of the defendant where his character is not put in issue.

■ But the law is settled beyond discussion that the rule requiring the exclusion of evidence offered to prove that defendant has committed other offenses than the one charged does not apply to evidence which is relevant and competent to prove the charge against the defendant on which he is being tried. As this Court said in Hardy v. United States, 8 Cir., 199 F.2d 704, loc.cit. 707:

"It has been repeatedly held that the rule will not be given application to exclude evidence which may incidentally show arrest, incarceration or conviction for some other offense, but which has relevancy and competency otherwise, and which the trial court responsibly deems a necessary or not inappropriate means in a particular situation in establishing some material fact or aspect of the prosecution's case."

■■ In each of the instances complained of by appellant the evidence received was relevant and competent to establish facts material to the case of the prosecution. It was charged that Mason and defendant were associated in the commission of the robbery so proof of their prior association wherever it occurred was manifestly competent. That they began their intimacy in the St. Cloud Reformatory was incidental. Likewise, their action together preparatory to the robbery included their stopping at Kerkhoven, Minnesota, where defendant placed a long distance telephone call to Marlys Rogers assuring her that he would soon make payment to her. There was evidence of the call from Kerkhoven to Marlys Rogers' telephone number other than Mason's, and the incident was corroborative of Mason's account and probative of the identity of defendant as Mason's associate in the crime. That defendant's relations with Marlys Rogers were stated by him to be outside of the marital relation was incidental.

■ Also the admittedly accurate description of defendant produced by the police department was clearly relevant to the inquiry as to his identity with the bank robber. That the occasion for making the record was "in connection with an arrest or detention" was also merely incidental.

We hold that the court did not err in receiving all of the evidence above referred to.

■ (2) As to the cross examination of defendant's witness Henrietta S. Blanchard and her son. She testified she saw defendant in Minneapolis at about 4:30 p. m. on the day of the robbery when he gave her a ride home. She was the widowed mother of many children and was living on her social security in a home she rented from Bram's sister which was next door to Bram's home. She lived next door to Bram for seven years. Her fifteen year old son, Lamont K. Blanchard, also testified that he saw Bram and his Lincoln car parked in back of his (Bram's) home at five o'clock on the day of the robbery. Mrs. Blanchard had two other sons, aged 21 and 23 respectively, who did not testify. She said that "naturally" they were all well acquainted with Bram after living for seven years next door to him. She answered as to one of the boys that he was committed to the St. Cloud Reformatory for receiving stolen property but when the objection was made that the question was not proper cross examination, the court declared that it was not. The court also sustained objections to questions concerning commitment of the other boy. But on the prosecutor's stating that he wanted to find out whether the son's offense was in any way related with Bram as far as she knew, the answer was permitted and it was "No." The cross examination to discover whether grounds existed for bias, prejudice, sympathy or interest in favor of Bram on account of any possible connection with Bram and the children of the witness was not improper. It resulted in no evidence of misconduct on the part of the witness or defendant and no prejudice to him.

■ Likewise, as to the cross examination of the alibi witness Lindgren.

He lived in a house owned by Bram's mother close to Bram's house. It was brought out in his cross examination that he had been found guilty of careless driving and assault and battery for which he received suspended sentence and was also arrested for being drunk but was never found guilty of more serious offenses. Apparently defendant was willing to have such facts disclosed and made no objection to any of the questions propounded. Defendant was in no wise prejudiced by the cross examination or in position to complain of it here.

Consideration of the cross examination of the several witnesses who testified to an alibi for defendant convinces that it was properly conducted under close control by the court and there was no erroneous ruling.

(3) The complaint is made against the court's instructions "that the court made a one-sided and unfair summary of the evidence giving greater weight to the government's evidence and * * * failing to sufficiently comment on" circumstances favorable to defendant.

Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C., provides in part that no party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

■ Appellant did not take exception to either the summary or any other instructions on the trial. To be available on appeal such exceptions must be taken.

■ We have carefully examined the instructions given the jury and are convinced that they were impartial, fair and appropriate and there was no error therein prejudicial to the defendant. The court made no attempt to declare what the true facts in the case were and there was no summarizing of evidence to the prejudice of defendant. The conviction was based on substantial, competent evidence which clearly demonstrates the guilt of defendant and there

was no miscarriage of justice so there is no basis afforded for defendant to urge plain error upon this Court. Fed.Rules Crim.Proc., Rule 52(b), 18 U.S.C.; Kreinbring v. United States, 8 Cir., 216 F.2d 671; Mitchell v. United States, 8 Cir., 208 F.2d 854; Mitchell v. United States, 8 Cir., 221 F.2d 554.

Affirmed.