Kenneth J. McDONALD, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16639.

United States Court of Appeals
Ninth Circuit.

Sept. 14, 1960.

738

Arthur H. Tibbits, David L. Skinner, Jr., San Francisco, Cal., for appellant.

Howard W. Babcock, U. S. Atty., Arthur M. Taylor, Jr., Las Vegas, Nev., for appellee.

Before BARNES and HAMLIN, Circuit Judges, and POWELL, District Judge.

BARNES, Circuit Judge.

Appellant was convicted by a jury of violating 18 U.S.C. § 2421, commonly known as the Mann Act. His conviction was not appealed. After serving two years of his five year sentence, appellant moved to vacate and set aside the judgment under 28 U.S.C. § 2255. After the preparation of the manuscript of the trial proceedings, a hearing was held by the district court, at which appellant was represented by counsel, but was not personally present. After the hearing, this motion to vacate and set aside the sentence was denied. This is an appeal from such denial. This Court has jurisdiction of the appeal.

At the original trial appellant was represented by appointed counsel. At the § 2255 hearing, he was represented by appointed counsel. On this appeal, still other appointed counsel represented him. This Court cannot refrain from expressing satisfaction in reading a record such as that which is now before us, disclosing as it does the willingness of four several counsel to give of their time and energy without compensation, in order that a defendant and appellant with limited funds may have the ingenious and enlightened representation that has so evidently here been received by such appellant. We thank each such counsel for their readiness so to act, in accord with the finest traditions of our legal system.

Appellant relied on five contentions in support of his motion. They were:

1. Appellant was convicted by perjured testimony.

2. Appellant was prejudiced by the publication of a newspaper article.

3. Appointed counsel at the trial neglected and refused to subpoena a witness who would have vindicated appellant.

4. Appointed counsel at the trial was guilty of neglect and malpractice.

5. Petitioner was deprived of his constitutional rights and subjected to cruel and unusual punishment while held in the city jail.

On this appeal, appellant urges for the first time three points not urged below.

*First,* that he had no preliminary hearing, and his arraignment was delayed; *second,* that his bail was raised from $3,000 to $7,500 in his absence; and *third,* delay in hearing the motion to vacate sentence resulted in a deprivation of due process. Additionally, appellant urges, as he did below, the following errors: *fourth,* that inflammatory press reports which appeared in the local newspaper on the day his case was called for trial and commenced, prevented him from having a fair and impartial trial; *fifth,* appellant did not have the effective assistance of counsel at his trial, or at the hearing of his motion to vacate sentence; and *sixth,* that appellant was entitled to be present at the hearing on his motion to vacate sentence. We consider each in turn.

So as to avoid confusion, we refer to the five volumes of the "Manuscript of Record" as Transcript I to V, inclusive; the "Supplemental Transcript of Record" as Transcript VI; the "Second Supplemental Transcript of Record" as Transcript VII; and the "Third Supplemental Transcript of Record" as Transcript VIII.

■ Appellant urges first he had no preliminary hearing, and that his bond was raised to $7,500 in his absence. He says this is so. The "Supplemental Transcript of Record" (Transcript VI) certified by the Clerk of the District Court, contains a copy of the United States Commissioner's "Record of Proceedings in Criminal Cases," dated October 24, 1956, showing that a complaint was filed against appellant, that he was arrested on that day, and charged with a Mann Act violation (18 U.S.C. § 2421); that he was advised on the day of his arrest of the nature of the complaint made against him; of his right to obtain counsel; and of his right to have a preliminary hearing. It further recites he already had counsel, "a Mr. Harry Claiborne," and that he "waived preliminary hearing before the Commissioner."

The "Second Supplemental Transcript of Record" (Transcript VII) shows that on November 21, 1956, appellant appeared in court without an attorney; an attorney was conditionally appointed for him (Mr. Ray Earl); appellant was arraigned and a copy of a grand jury indictment was handed him. It shows appellant entered a plea of not guilty. His attorney moved the court to reduce the previously set $5,000 bond. *This motion was granted,* and bail was fixed at $3,000. On November 23, 1956, the same transcript shows that Mr. Earl was relieved as appellant's attorney, and that Mr. Harry E. Claiborne was appointed to represent appellant.

Transcript I contains and shows the indictment filed. Transcript VIII contains the stenographic report of the proceedings of November 21st and November 23rd, 1956. These confirm the court's records.

Nowhere, except through appellant's bald statement, is there any evidence that appellant's bail was raised or changed in any way after its reduction to $3,000. In his petition, appellant states: "Later that evening a City Jailor told me my bail had been raised to $7,500." Apparently appellant never sought confirmation of that hearsay, nor did he ever ask his attorney about such an alleged raising of bail, for no mention is made of such inquiry by appellant. The very newspaper story to which appellant makes objection on other grounds (and which will later be considered) stated on the day his trial commenced that his bail was $3,000.

There seems no basis for relief at this time, subsequent to conviction after indictment, even though the appellant had no preliminary hearing on the original complaint, and even though his bail had been raised to $7,500. But we find no credible evidence that either of such events (*i. e.,* failure to arraign and raising of bail) took place. We find no error in the trial court's holding that they did not.

■ Appellant claims a delay in the hearing of his motion for relief under section 2255. There was delay, but it

was occasioned largely by the necessity of obtaining a complete transcript of the evidence given against appellant at the trial. His petition was filed October 16, 1958. On December 30, 1958, the court below appointed Lester H. Berkson, Esq., as counsel for defendant on all matters pertaining to said motion to vacate and set aside the sentence. After conferences between appellant and his attorney, Mr. Berkson asked the court below to order a complete transcript of proceedings at the trial. Such an order was entered on March 4, 1959, "without payment of costs by petitioner." Two continuances of the hearing were then requested by appellant's counsel. (June 3, 1959 to June 18, 1959, and June 18, 1959 to June 29, 1959. Tr. Vol. I, p. 49.) While there was some delay between the filing of the petition on October 16, 1958, to the appointment of counsel, this was a matter requiring thorough preliminary consideration by the district court. He could not drop all business relating to unconvicted prisoners in order to facilitate his consideration of appellant's petition. After the appointment of counsel, any further delay was incidental to the obtaining and study of the transcript and necessary for the protection of, and beneficial to, the appellant. We find no prejudicial delay.

We next turn to the grounds urged below, and decided there. The theme of appellant's first point is that he should have been believed by the jury, and the two witnesses who participated in the sordid happenings should have been disbelieved. That their testimony was "perjured lies" was to be shown, swore appellant, through "new evidence." This "new evidence" was attached as Exhibit A to the petition. It is a purported statement by one Delbert Glenn Holms witnessed by one Ronald E. Anderson. It is dated November 20, 1956, but is witnessed August 15, 1958. (Holms was a jailmate of appellant and one William Elmenhorst.) In it one witness who testified against appellant (William Elmenhorst) is alleged to have spoken to Holms and taken all the blame for forcing his then wife (the second witness against appellant) into prostitution. Elmenhorst is further alleged to have admitted he and his wife "framed" the appellant.

This was *not* new evidence, either theoretically or actually. The appellant states he showed it to both attorneys appointed before the trial. Appellant thus knew of what Holms would have testified to prior to trial. The attorney who represented appellant (Claiborne) remembered the statement well. It was thoroughly discussed with appellant before his trial. Mr. Claiborne had decided not to use Holms' testimony, for "he was suspicious of it." This suspicion arose from four circumstances: (a) The statement used the same language as had appellant in describing the matters—"it used defendant's words in detail." (b) Appellant had notified no one of the statement until after Holms had left the jail. (c) Holms had been confined in the tank with appellant McDonald. (d) Holms gave his "statement individually" to appellant and not to another inmate or to a jailor.

Whether right or wrong, Claiborne made a decision as to trial strategy, and advised against the use of the witness Holms. Claiborne says appellant agreed Holms should not be used, and Holms was not used as a witness.

In this connection, a letter written by appellant to Claiborne immediately after the trial at which he was convicted was before the district court in the hearing of this motion below. It is of considerable significance. It reads as follows:

"Dear Harry:

I just wanted to drop a line and thank you for the wonderful fight you put up for me. I know losing meant as much to you as it does to me. (Well almost). I have written my father and told him of the fine job you did. I explained to him we were cold decked. I told him to get in touch with you to see what can be done. I wish you would also drop him a line and explain to him what can be done now if anything. This

sentence has me mixed up. I have been told I must do 5 straight even if the fine is paid, and paid or not there is no parole when you get a fine. If you get a chance drop over for a minute and get me straightened out on it. Also I would like to know what can be done now. I believe my dad will come up pretty good to get this sentence cut. Again let me thank you for all you did for me. Maybe we can still gain a little at what we have lost.

Sincerely,
Kenny"

■ If the witness William Elmenhorst had made false charges against appellant and was willing to perjure himself against appellant, this was known to appellant before, and during, and immediately after his trial. Knowing this, he did not propose to use the Holms contradictory testimony. Having decided not to use it, he cannot now complain. *Cf.* Taylor v. United States, 8 Cir., 1956, 229 F.2d 826, 833–834, where it is said:

"To allow an accused person, with actual advance knowledge that perjured evidence was knowingly to be used by the prosecution, to remain silent as to that situation during the entire trial and after his conviction to attempt to set the judgment aside by collateral attack would seriously interfere with the proper orderly administration of criminal law. The accused is fully entitled to present, at his trial, all evidence in defense of which he has actual knowledge at that time. He cannot remain silent as to such thus hoping to gain an acquittal on the evidence actually presented and thereafter expect to have a second trial and chance for acquittal on evidence he has knowingly concealed at the time of trial. He must be deemed to have waived his rights because of such inaction. Even constitutional rights may be waived."

■ This logically brings us to appellant's fifth point, that he did not have effective assistance of counsel at his trial. This is largely based upon the charge that such counsel would not subpoena Holms to testify at the trial. There was good reason not to, as appellant apparently thought at and after the trial. This contention was answered in the district court's mind by Mr. Claiborne's very clear explanation. It was a matter of trial strategy. See Green v. United States, 1 Cir., 1958, 256 F.2d 483, 485. We find no error.

■ We next have the charge that the publication of a newspaper article prevented the appellant from having a fair trial. This newspaper article described appellant as a "white slaver" and "one of the top procurers of females on the West Coast." It stated he had "connection with brothels in both Beatty and Ely, Nevada"; that although he denies this charge, "McDonald admitted to officers that he has been pandering since he was 14, and can't do any other kind of work. Since 1949, McDonald has a record of 18 arrests for narcotics and an assortment of vice charges involving prostitutes."

There is no question but that anyone of ordinary morals who read this newspaper story and believed it would have been prejudiced against appellant. We must therefore examine the record to see how the matter was handled by the trial judge. He did several things:

(1) The court peremptorily excused, on its own motion, and without discussion or delay, every prospective juror who had read the newspaper article, in whole or in part. Eleven jurors were thus excused. A twelfth who had "glanced" at it was later excused. A thirteenth juror whose husband was a deputy coroner and had formerly been a policeman, was excused by the court.

(2) The court entered an order (at the start of the case and before the prospective jurors were questioned by counsel) that

"nothing must be reported concerning this case or this defendant, and when I say reported I mean com-

municated to the public in any shape, manner or form, nothing must be reported which is not a matter of court record; nothing must be reported until it is admitted in evidence by the court; no statements made by the attorneys out of court may be reported; no pictures may be taken in court, even when the Judge is off the bench; the defendant must not be discussed other than in reference or recitation of matters that are admitted in evidence here."

(3) The court asked the members of the jury to refrain from reading any newspaper accounts of the proceedings, or listening to any television or radio communications in regard to them.

(4) The court explained to prospective jurors why he was making the orders he had made and proposed to make.

"The purpose of all this is to see that both the government and the defendant receive a fair trial. That is what we are here for today. That is the only purpose we came into court for this morning is to see that this trial that is about to take place is conducted fairly. That is the only duty we have."

(5) The court discussed thoroughly with prospective jurors the rights of any defendant, and particularly this appellant. This was not done hurriedly, or perfunctorily. It covered ten pages of transcript.

(6) The court granted defendant ten peremptory challenges. He exercised *eight*. With one such, he excused a Mrs. Price, who had not read, but had discussed (apparently with an excused juror) not the facts, but the nature of the case. The appellant's counsel was obviously attempting (and very properly from the standpoint of trial strategy) to get an all male jury. In this he succeeded. He left two peremptory challenges unused.

(7) After the jury was impaneled, the court carefully and at length forcefully gave the usual admonitions to the jury, including an admonition

"to refrain from reading any newspaper articles or listening to any radio or television broadcasts concerning this matter. If one of those things happens to be on the air while you are listening turn it off. Now I know this is something the court is asking you to do and I know you will do it because you are all, from your responses to questions here and from your general demeanor here, have just one purpose, to see that this case is fairly tried and that both the government and the court have a fair trial. I am not going to say anything more about newspapers or the radio or anything like that during the trial unless some question should arise."

(8) The court was not requested to make any other or further admonitions. No reference to newspapers, radio, or television took place again during the trial.

No suggestion has been made of any proof that any juror sitting in this case actually read any newspaper account of any acts of, or charges against, the defendant; or that any radio or television account was broadcast relating to defendant. After the court, by his forceful and direct action in peremptorily excusing every juror who had even glanced at the newspaper account; and after careful and forceful admonition as to what the jurors could and could not do; and after having made an order (upon voir dire prior to the trial and immediately upon ascertainment of the existence of the first newspaper account) forbidding the publication of anything not in evidence; and after ordering the attorneys not to talk—appellant and his counsel, without a shred of evidence in support of their theory, ask this court to presume the jurors did not obey the court's instructions and "must have" read or heard something in some newspaper account or broadcast that from the standpoint of legal proof is nonexistent.

The court below gave no credence to such a theory. We think he acted properly. We give no credence to such an evanescent theory utterly lacking in factual basis. We find much to praise in the manner in which the trial judge—one of long trial experience—handled this difficult problem. We assume the jury understood and followed his instructions, not the contrary. We find appellant had a very fair trial, and we find no error.

■ We need not dwell long on whether appellant had effective assistance of counsel. We have read the entire transcript, and we find appellant was represented by vigorous, experienced, and competent counsel at each stage of his proceedings—at his trial, on the hearing of the motion below, and on this appeal. We find no evidence that the appellant's representation was not adequate and meaningful; the trial never approached the "farce requiring the court to intervene in behalf of the client." Black v. United States, 9 Cir., 1959, 269 F.2d 38, 42.

■ We come to appellant's next point, that he was entitled to be present at the hearing of his motion to vacate sentence. Appellant asserts that since fact questions as to events in which he participated were decided at the hearing, he had a right to be present under the rule in United States v. Hayman, 1952, 342 U.S. 205, 72 S.Ct. 263, 267, 96 L.Ed. 232. It is true that in the Hayman case the respondent alleged he did not have effective representation of counsel, as guaranteed defendants in federal courts by the sixth amendment. The same charge is made here. In Hayman, however, the issue arose through an alleged lack of disclosure of an alleged conflict of interest created by the dual representation by counsel of both Hayman and a defendant in another case, who was a principal witness against Hayman in his case. Further, Hayman had no notice of the hearing, and no opportunities to rebut the counsel's representation (found to be a fact by the district court in Hayman) that the dual representation had

been "with the knowledge and consent, and at the instance and request of [respondent Hayman]." In both the Court of Appeals and in the Supreme Court, in Hayman, the government conceded that respondent's motion raised factual issue which required respondent's presence at a hearing. Therefore, said the Supreme Court in Hayman,

"We conclude that the District Court did not proceed in conformity with Section 2255 when it made findings on controverted issues of fact relating to respondent's own knowledge without notice to respondent and without his being present."

342 U.S. at page 220, 72 S.Ct. at page 273.

This statement is urged as controlling upon this Court under the circumstances of this case. We cannot agree. In Hayman, the issue was whether the dual representation had been with the knowledge and consent and at the instance and request of defendant. He was given no opportunity to testify, *or present evidence,* as to whether it had or had not been.

In this case, the appellant alleged perjured testimony was presented. He presented his evidence, the statement of Holms. He *argues* that had this evidence been presented to the jury this testimony "would have very clearly vindicated petitioner and proven Elmenhorst a self-admitted procurer for his own wife, in fact Elmenhorst admitted on the witness stand that he took his wife to different motels and waited in his car while she performed acts of prostitution."

Thus, appellant's own statement shows the affidavit offered would have been cumulative to Elmenhorst's own testimony; and to the testimony appellant himself gave to the same effect.

Even if the authenticity of the statement could have been established, it would not and could not establish perjury on the part of anyone. Nor could it, once authenticated, have been ipso facto a basis for establishing an admittedly

unfair trial, as was true with respect to Hayman's counsel's dual representation.

We thus find no necessity for the personal presence of appellant here that existed in the Hayman case. In Hayman, Mr. Justice Vinson refers to "the very purpose" of section 2255; that it "is to hold any *required* hearing in the sentencing court * * *." 342 U.S. at page 220, 72 S.Ct. at page 273. (Emphasis added.) Furthermore,

> "the express language of Section 2255 that 'a court may entertain and determine such motion *without requiring the production of the prisoner at the hearing*' negatives any purpose to leave the sentencing court powerless to require production of the prisoner in an appropriate case."

342 U.S. at page 221, 72 S.Ct. at page 273. (Emphasis added.) And Mr. Justice Vinson then significantly adds:

> "The existence of power to produce the prisoner does not, of course, mean that he should be automatically produced in every Section 2255 proceeding * * *. Whether the prisoner should be produced depends upon the issues raised by the particular case. Where, as here, there are substantial issues of fact as to events in which the prisoner participated, the trial court should require his production for a hearing."

342 U.S. at pages 222–223, 72 S.Ct. at page 274.

We believe the statute under discussion still leaves something to the judicial discretion of the trial judge. It was here exercised, and we concur in the manner in which it was exercised, finding no *substantial issue of fact* as to events in which the prisoner participated.

Petitioner next alleged he was deprived of his constitutional rights and subjected to cruel and unusual punishment by being placed in solitary confinement while held in the city jail. At the hearing his counsel stated:

> "I have no further corroborating evidence to show as far as this thing being a substantial violation of petitioner's right, and for that reason **I** do not present it as an argument."

The court, however, heard testimony after inquiring into this subject. He first established that no contention was being made that during the ten weeks between arrest and trial defendant was denied the privilege of talking to his counsel or consulting with him. There was then established the fact that appellant McDonald was not popular with his jailmates and was placed in a single cell, "was in an open cell most of the time," and may have been in solitary "for a couple of days; not more than a week" because of his own actions. The district judge conducted a careful cross-examination of the jailor at the hearing. This jailor saw him every day. An F.B.I. agent testified he had visisted appellant ten or twelve times at appellant's request; had requested appellant's attorney to visit appellant eight or ten times; that at no time did appellant claim he had been in solitary confinement. Nor had appellant ever made such a complaint to his attorney, Claiborne, except as to a fraction of one day. Claiborne visited appellant freely prior to the trial.

We have quoted some facts at some length in this opinion because of appellant's final position that the evidence, when viewed "sanely," shows he was not guilty "of this absurd charge of white slavery," and that the evidence could not sustain the verdict as found by the jury. This brings us to where we started—that appellant believes he should have been believed by the jury, and the two witnesses who testified against him not believed. He asserts he was an innocent business man framed by two youngsters whom he was trying to befriend. He fails to point out, entirely apart from the testimony of the two witnesses described above, what the jury should have concluded was the purpose, as disclosed by his own testimony, of a business man without a business or any visible means of support for at least nine months prior to his taking the girl from the San Francisco area to Nevada, and what necessity there might have been of his going to Las Vegas on a business

deal; the fact no effort was made by appellant to seek employment, or to arrange "the deal" for some seven weeks; his first registering under an assumed name without explanation; and his living with his alleged newly found casual friends (girl and boy) in one apartment; his paying their rent with sixty odd dollars of the last ninety dollars he had; his knowledge of the sixteen year old girl's acting as a prostitute, but nevertheless visiting her "quite often"; his refusal to tell the F.B.I. as to any knowledge on his part of her acts of prostitution; his "oral" property settlement with his wife; and his uncertain "gambling winnings" to account for his money; and his thereafter asking the jury to believe him rather than the two witnesses appearing against him. To say the appellant's sole witness in his own defense—himself— was far from convincing as to truth, honesty and integrity, is a gross understatement.

Suffice it to say we find no merit in appellant's last point concerning the insufficiency of the evidence.

Finding no error, the determination of the district court on appellant's motion to vacate and dismiss under section 2255 is affirmed