UNITED STATES of America,
Plaintiff-Appellee,

v.

Ben Herbert SUTHERLAND, Defendant-Appellant.

No. 31044.

United States Court of Appeals,
Fifth Circuit.

July 11, 1972.

Rehearing Denied Sept. 5, 1972.

Donald J. Hand, San Antonio, Tex. (Court appointed), for defendant-appellant.

William S. Sessions, U. S. Atty., Wayne F. Speck, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and RONEY. Circuit Judges.

RONEY, Circuit Judge:

For the second time a jury has convicted Ben Herbert Sutherland of three criminal charges relating to robbery of a San Antonio, Texas, bank. Finding that there was sufficient evidence to convict defendant of the offenses charged and that the defendant had a fair trial, we affirm.

On October 1, 1968, at approximately 2:00 P.M., the Northeast National Bank of San Antonio was held up by William Kump. Kump, who was brandishing a gun, had stuffed $5,457.00 in his paper bag and was fleeing through the bank's main entrance when he encountered a police officer who was anticipating his departure. Kump fired at the officer, but missed. Kump was then killed by the policeman's return fire. Subsequently, Sutherland was indicted for conspiracy to rob banks in violation of 18 U.S.C. § 371, for robbery of the Northeast National Bank in violation of 18 U.S.C. § 2113(a), and for robbery of the Northeast National Bank with a danger-

ous weapon in violation of 18 U.S.C. § 2113(d).

Sutherland was tried on those charges in March, 1969, and convicted on all counts. However, the conviction was reversed on appeal because the district court had permitted eyewitness in-court identification testimony to go to the jury after finding that photographs shown to the eyewitnesses by the FBI were impermissibly suggestive and gave rise to a very substantial likelihood of irreparable misidentification. United States v. Sutherland, 428 F.2d 1152 (5th Cir. 1970).

The defendant was again tried and was again convicted on all three counts.[1] This time, however, with the eyewitness identification excluded, there was no evidence placing the defendant at the scene of the bank robbery. Accordingly, the defendant raises a strong question of sufficiency of the evidence. He also contends that reversible error was injected into his trial by (1) evidence of defendant's incarceration in an Arizona jail; (2) biased conduct on the part of the trial judge; (3) supplementary instructions, including the *Allen* charge; and (4) prejudicial newspaper publicity.

## I. Sufficiency of the Evidence

■ It is now axiomatic that on reviewing the sufficiency of evidence to support a conviction the evidence must be viewed in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942). Accordingly, all reasonable inferences are drawn, and all reasonable credibility choices are made, which support the jury's verdict. Gordon v. United States, 438 F.2d 858 (5th Cir. 1971). Although the evidence of guilt in this case is circumstantial, that does not change the standard for determining the sufficiency of the evidence. As we recently said in United States v. Warner, 441 F.2d 821, 825 (5th Cir. 1971):

"It is true that much of the evidence in this case is circumstantial, and that at one time some courts expressed the view that in criminal cases based on circumstantial evidence a special rule required the district court to grant the motion for acquittal unless the circumstantial evidence excluded every reasonable hypothesis other than that of guilt. The Supreme Court, however, has said that '[c]ircumstantial evidence * * * is intrinsically no different from testimonial evidence' and that 'where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect.' Holland v. United States, 1954, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166. The same test, therefore, for judging the sufficiency of the evidence should apply whether the evidence is direct or circumstantial. Indeed, that is the prevailing rule in the federal courts today. *See* 2 C. Wright, Federal Practice & Procedure, § 467, at 258. To reconcile some older Fifth Circuit cases with the Supreme Court's clear holding in *Holland,* this Court has rephrased the substantial evidence test: in criminal cases based on circumstantial evidence our task is to determine whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence. United States v. Andrews, 5 Cir. 1970, 427 F.2d 539, 540; Surrett v. United States, 5 Cir. 1970, 421 F.2d 403, 405. Notwithstanding these differences, which some might term verbalistic, we are in agreement with our brothers in other circuits that whether the evidence be direct or circumstantial, the matter of the defendant's guilt is for the jury to decide unless the court concludes that the jury must necessarily have had a reasonable

---

1. At sentencing the government dismissed the bank robbery count (18 U.S.C. § 2113 (a)) and the defendant was sentenced only on the counts charging conspiracy and bank robbery with a dangerous weapon.

doubt. *See* 2 C. Wright, Federal Practice & Procedure, § 467, at 259."

The evidence, stated favorably to the government, begins in the Summer of 1968 in the Maricopa County, Arizona, jail where Sutherland and Kump were cellmates. Charles Fortney, also a cellmate, testified that the occupants of the cell would have general "open forum type" discussions, led by the defendant, concerning bank robberies. These discussions were general and no specific plans were formulated. However, various situations were evaluated "to see if [they] were valid." An "ideal" situation would be a small suburban type bank with few people in the area and no bank guard. The robbery would "ideally" take place at a time when there was a minimum of traffic. The getaway car should be stolen from an area where the car would have been left standing for a while, such as a bowling alley or movie theatre. During the conversations Sutherland stated "that you go to the grocery store for groceries and you go to the bank for money."

While in jail Sutherland, who referred to Kump, a much younger man, as "Son," sought to persuade Kump to bail him out. On September 6, 1968, Kump bailed himself out of jail. On September 8, Kump bailed out Sutherland by paying $111 to a bonding company and posting $1,000 collateral. Kump gave the defendant about $900, which was half of the money Kump had left and they set out for San Jose, California.

While in San Jose Sutherland asked Chuck Boyle, owner of a drycleaning establishment in which Sutherland previously had worked, where he could get a gun. This inquiry was unproductive since Boyle was unable to provide a pistol. However, Sutherland had previously worked at the cleaners with Ruben Martinez, and according to Martinez, Sutherland probably knew that Martinez had a gun. Kump, who did not know Martinez prior to going to San Jose, sought to buy a pistol from Martinez.

The sale was not made but shortly thereafter the gun was stolen. It was Martinez' stolen pistol which Kump had in his hand at his death.

Also in San Jose Kump became acquainted and enamored with Dessie Drake, and Sutherland with Elinor Helman. Although it appears that neither Kump nor Sutherland was working, they treated the women to expensive evenings.

In late September Sutherland and Kump departed, leaving behind varying impressions of where they were headed. Boyle believed they were going to Chicago, Kump's home, and Mrs. Helman was told they were going to Mississippi. In fact, the farthest east they got was Houston, Texas. From that point they went west to San Antonio, arriving there on September 26, 1968. The pair checked into the Gunter Hotel in downtown San Antonio on that date as "Joe McDonald & Son" from Houston, Texas, representing Western Electric. On September 28, they checked into the Park Plaza Motel giving the same misrepresentations.[2] Kump took his luggage back to the Gunter on September 30, although both stayed at the Park Plaza that night. The morning of October 1 they checked out of the Park Plaza. At approximately 2:00 P.M. that day, the robbery was attempted.

Sometime after 1:30 P.M., Sutherland, using the name "Frank," attempted to call Boyle in San Jose but could only reach Boyle's secretary. The secretary testified that although the calls were made after 1:30 P.M. CDT, she could not say how long after. At 4:19 P.M. CDT, Sutherland called Boyle from the Gunter Hotel and requested that Boyle send him $85.00 so he could return to San Jose. Boyle refused but suggested Sutherland call Mrs. Helman. Sutherland called Mrs. Helman within six minutes after concluding his conversation with Boyle, but he called not from the Gunter Hotel but from the W. T. Grant Co. Mrs. Helman was unable to send the

---

2. The Park Plaza is at 2908 Broadway and the Northeast National Bank is at 5207 Broadway.

money. At 6:12 P.M. CDT, Sutherland again called Boyle and this time was successful in obtaining money for bus fare. Boyle obtained the money from Dessie Drake and wired it to Sutherland.

During one of the two calls to Boyle, Sutherland told Boyle that Kump was dead. The Government produced evidence that the only two newspaper articles concerning the robbery which appeared prior to the telephone calls to Boyle did not identify the dead bank robber. However, the devastating effect of this evidence was ameliorated by Boyle's testimony that Sutherland had said he had an intuitive feeling that the unidentified robber was Kump.

Sutherland received the Western Union money order at 9:38 P.M. CDT, and departed by bus at 10:30 P.M. CDT, for San Jose, taking with him Kump's luggage. When located and interviewed by the FBI on October 3 in San Jose, Sutherland could give no explanation of the reason he took Kump's suitcase.

The government produced other evidence by which it attempted to connect Sutherland with the bank robbery. Sutherland never indicated to any of the witnesses what business or occupation, if any, he was engaged in during this period. On September 27, Sutherland wrote to Mrs. Helman that he "was a couple days longer taking care of business than I figured. But now I should be on my way over the weekend, . . ."

Sutherland told the FBI that he and Kump had separated on the morning of October 1 and that Kump had said he was going to visit relatives in San Antonio to get financial assistance. Kump's father testified that Kump had no relations in the San Antonio area, and to his knowledge his son had never been in Texas before. On the other hand, the defendant as a boy had lived only seven or eight blocks from the location of the bank.

The majority of the defendant's witnesses were persons who witnessed the robbery or were in the immediate vicinity. None of them saw any participant except Kump and none saw the defendant in the area of the holdup.

In addition the defendant produced two witnesses for the purpose of demonstrating that he was in downtown San Antonio at the time of the robbery. A bellhop at the Gunter Hotel testified to seeing the defendant in the lobby of the hotel two or three times on October 1. But the testimony was not definite and construing the evidence in support of the verdict, the jury could have found that the bellhop saw the defendant only in the morning. A waitress at a downtown restaurant testified that the defendant offered to sell her a cigarette lighter about 2:00 P.M. on October 1. However, the weight to be given the testimony was affected by her admission that the date of the offer was suggested to her as being October 1 by defendant's attorney at a pretrial interview. The jury could have properly determined to give the testimony little or no weight.

#### (a) Conscispiracy

Count One of the indictment charges the defendant with conspiring with Kump to rob banks in the Western District of Texas insured by the Federal Deposit Insurance Corporation. The essential elements needed to show a violation of that portion of 18 U.S.C. § 371 under consideration here are an agreement to commit an offense against the United States, coupled with an overt act by one or more of the conspirators to effect the object of the conspiracy. United States v. Falcone, 311 U.S. 205, 61 S. Ct. 204, 85 L.Ed. 128 (1940); Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). In this case, it is not necessary to prove that the conspirators had agreed to rob the Northeast National Bank, but it is sufficient to show that they conspired to violate the bank robbery statute, 18 U.S.C. § 2113. Nelson v. United States, 415 F. 2d 483 (5th Cir. 1969).

The defendant complains that there is no direct evidence of a conspiracy in

this case. However, criminal conspiracies are secretive in nature and frequently proof of the existence of a conspiracy must rest upon inferences drawn from circumstantial evidence. Rodriguez v. United States, 373 F.2d 17 (5th Cir. 1967).

Here, although the Maricopa County Jail bank robbery seminar was not shown to result in a plan to rob a particular bank, it did demonstrate the common interest Kump and Sutherland shared in such activities. The "ideal" situation discussed at that time corresponded in many respects with the circumstances of robbery of the Northeast National Bank.

Against this background there were numerous other circumstances from which the jury could have determined that the evidence was inconsistent with the defendant's innocence. Sutherland and Kump remained together for the entire time, which was almost a month, following their release from jail. Sutherland was sufficiently influential with Kump to persuade Kump to bail him out of jail and give him half of Kump's money. During the period following their release from jail, no one who testified could discuss any employment and yet the two spent money freely. When they did go away on "business" they gave destinations other than their actual destination. Prior to leaving, they sought and stole a gun. Upon arrival in San Antonio they registered under assumed names giving a false business identification and a false address. As these circumstances accumulate, they become less consistent with any hypothesis of innocence.

After the robbery, two circumstances occurred which strongly point to Sutherland's involvement with Kump. First, prior to the identification of Kump as the dead robber in the newspapers, Sutherland told Boyle that Kump was dead. Even assuming Sutherland did see the news stories and intuitively felt it was Kump, the most reasonable inference would be that Sutherland based his feelings upon knowledge that Kump was going to rob a bank. And knowledge that Kump was going to rob a bank conflicts with the story Sutherland told the FBI that Kump had said on October 1 he was going to seek financial assistance from local relatives.

Second, Sutherland left with Kump's suitcase. This is inconsistent with Sutherland's statement that he did not know of Kump's death until October 2 and only intuitively felt Kump was dead. The jury could decide that mere intuition of someone's death is not sufficient reason to carry that person's suitcase of gym clothes and other common articles of apparel on a bus from San Antonio to San Jose. It would not be unreasonable to conclude that only if Sutherland *knew* Kump was dead would he take the suitcase. Knowledge could be gained only from presence at the scene or an awareness of where Kump was going.

The taking of Kump's luggage is evidence of what Sutherland clearly demonstrated after the robbery—flight and concealment. The normal reaction of someone who feels that his close companion may have been killed is to make some inquiry. Sutherland left town. By taking Kump's luggage, Sutherland could hope to conceal his relationship to the dead robber. When Sutherland made his telephone calls to obtain money so he could immediately depart San Antonio, he made the calls from pay phones in three different places. In one case, less than six minutes separated the calls, yet they were made from two different locations. Again, this reflects flight and concealment, both of which are evidence of the consciousness of guilt and therefore evidence of guilt itself. II Wigmore on Evidence §§ 276, 278 (3d Ed. 1940).

The government contends that the defendant's false exculpatory statements given to the FBI evidence a consciousness of guilt. In the interview on October 3 in San Jose, Sutherland told the FBI that he learned of Kump's death in El Paso on October 2 while

traveling by bus from San Antonio to San Jose. Yet, Sutherland had already told Boyle that Kump was dead. Accordingly, the jury could have found that Sutherland's statement to the FBI was false. Also, Sutherland told the FBI that on October 1 Kump had told him he was going to seek funds from relatives. The statement was false since Kump had no relatives in the area. The statement could be false either because Kump lied to Sutherland or because Sutherland lied to the FBI. Since Kump had little reason to lie to his companion about the matter, whereas Sutherland had a compelling reason to disassociate himself from Kump on October 1, the jury could have found that Sutherland had made a false statement to the FBI. Such a circumstance would evidence consciousness of guilt. Andrews v. United States, 157 F.2d 723 (5th Cir. 1946).

■ When viewed against the background of the Maricopa County Jail discussions, the pair's suspicious activity, their close association, the lack of employment, the theft of a gun and a car, the actual robbery of a bank, the inferences that Sutherland knew Kump was robbing a bank, and the strong inferences of defendant's consciousness of guilt considered together would permit a jury to conclude that the evidence is inconsistent with the hypothesis that the defendant was not guilty of conspiring to rob banks.

(b) Robbery with a Dangerous Weapon

■ In order to sustain a conviction for bank robbery in violation of § 2113(d) as charged in the indictment, it is necessary that the evidence show that the defendant participated in the robbery of the Northeast National Bank. However, it is not necessary to prove that the defendant was at the scene of the robbery, or in the immediate vicinity. United States v. Pope, 409 F.2d 371 (7th Cir. 1969); United States v. Bradley, 421 F.2d 924 (6th Cir. 1970). Section 2 of Title 18 makes one a principal to a crime if he "aids, abets, counsels, commands, induces, or procures" or "willfully causes" a federal offense. The Supreme Court in Nye & Nisson v. United States, 336 U.S. 613, 619, 69 S. Ct. 766, 93 L.Ed. 919 (1949) stated:

"In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' L. Hand, J., in United States v. Peoni, 2 Cir., 100 F.2d 401, 402."

■ The evidence provides sufficient evidence of Sutherland's participation in the robbery to permit a jury to find that they had no reasonable doubt of the defendant's guilt.

The evidence that Sutherland was not seen at the bank and may have been in downtown San Antonio does not compel a contrary finding. First, Sutherland's lack of presence at the bank does not, by itself, exonerate him. Second, there is clear evidence that Sutherland had a dominating influence on Kump. Kump's father testified that his son was easily influenced by older people. While in jail, Sutherland referred to Kump as "Son" indicating an acknowledged ranking between them. Sutherland was influential enough to persuade Kump to part with $1,111 to bail Sutherland out of jail. Then, Sutherland was able to convince Kump to give him half of the money Kump had remaining. In light of these circumstances, a jury could infer that Sutherland had talked Kump into going into the bank alone while Sutherland remained elsewhere.

Accordingly, we find that the evidence was sufficient to sustain the conviction of the defendant on both counts.

II. Supplemental Instructions

On the second day of its deliberations the jury was given supplemental instructions by the court. The court gave the

*Allen*[3] charge in addition to additional instructions on the substantive bank robbery counts.[4] The defendant objected to the giving of any *Allen* charge.

Despite reservations, this Court has approved the giving of an *Allen* charge. United States v. Roberts, 455 F.2d 930 (5th Cir. 1971); United States v. Green, 433 F.2d 946 (5th Cir. 1970); Thaggard v. United States, 354 F.2d 735, 739 (5th Cir. 1965) (concurring opinion).

■ The charge given by the district court is not distinguishable in any meaningful way from versions of the *Allen* charge which have previously been approved in this Circuit. Hale v. United States, 435 F.2d 737 (5th Cir. 1970); Thaggard v. United States, *supra*. The defendant also contends that the district court was in error when it instructed the jury that "all litigation must end sometime" and that "if there is a hung jury, the case must be tried again." Similar instructions have been approved by this Court. Hale v. United States, *supra*; Sanders v. United States, 415 F. 2d 621 (5th Cir. 1969); Thaggard v. United States, *supra*.

During the supplemental instructions by the court, the jury was charged further as to "aiding and abetting." The defendant contends that the instructions given permitted the jury to convict the defendant if he "acquiesced" in Kump's activities. The charge complained of was as follows:

"If you think, if you believe that Ben Sutherland was downtown, minding his own business, had no idea what was going on out there, didn't acquiesce in it or didn't assist it or aid it or abet it in any way, then you ought to turn him loose, or if you think the Government has failed to prove he aided, abetted, counseled beyond a reasonable doubt then you ought to acquit him."

■ Since no objection was made to the instruction, the defendant may not raise the objection on appeal, Rule 30, F.R.Cr.P., and review is foreclosed unless the instruction was a plain error affecting substantial rights. Rule 52(b), F.R.Cr.P.

■ It would be plain error for the trial court to instruct the jury that Sutherland could be convicted of the substantive offense if he merely acquiesced in a robbery perpetrated by Kump. Nye & Nisson v. United States, *supra*. This was not the import of the court's instructions. The court instructed the jury that if Sutherland did not acquiesce, then he should be acquitted. The defendant contends that the converse was implied, i. e., that if the defendant did acquiesce, he should not be acquitted. However, when the entire portion of the charge relating to aiding and abetting is read as a whole, such implication is definitely negated. *Cf.* Jones v. United States, 131 U.S.App.D.C. 212, 404 F.2d 212 (1968). The jury was properly instructed that willful participation was required to be proved beyond a reasonable doubt before Sutherland could be convicted.

In any event, we seriously doubt that any implications arising from the use of the word "acquiesce" were noticed by the jury when they were not even noticed by the defendant's attorney. No plain error appears in this case.

■ The defendant also complains of supplemental instructions as to reasonable doubt. However, no distinct objection was made to the court's instruction and on appeal the defendant merely argues for "a more fair definition" of reasonable doubt. Without an objection this contention will not be reviewed on appeal.

### III. Evidence of Incarceration

■ The defendant contends that the prosecution adduced evidence of defendant's bad character by proving that in the Summer of 1968 the defendant was in the Maricopa County Jail. It is

---

3. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

4. The jury announced that it had already reached a verdict on the conspiracy count.

well established that the prosecution may not resort to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Michelson v. United States, 335 U.S. 469, 69 S. Ct. 213, 93 L.Ed. 168 (1948).

However, evidence of other criminal acts or prior trouble with the law is admissible if the evidence is substantially relevant for some purpose other than to show a probability that the defendant committed the crime for which he is being tried because he is a man of criminal character. Roe v. United States, 316 F.2d 617 (5th Cir. 1963); United States v. White, 444 F.2d 1274 (5th Cir. 1971); McCormick, Evidence § 157 (1954).

Evidence that the defendant was in the Maricopa County Jail was introduced in connection with Kump's bailing Sutherland out of the jail, and also as the scene of the bank robbery seminar. Evidence that Sutherland was in jail was a necessary concomitant of the proof that Kump bailed Sutherland out of jail. This evidence was relevant to show the dominating influence that Sutherland had over Kump and their close relationship. In view of the lack of evidence placing Sutherland at the scene of the robbery, the evidence of his influence over Kump was an important part of the government's case. Such evidence might tend to explain why Kump would go to, or at least enter, the bank alone. United States v. Levine, 372 F.2d 70 (7th Cir. 1967). The evidence was properly admitted.

The Maricopa County Jail was also mentioned as the scene of the bank robbery discussions. We held on the prior appeal, United States v. Sutherland, *supra*, 428 F.2d at 1158, "the substance of the conversations concerning the technique of robbing banks is admissible and should not be excluded merely because of the circumstance that the conversations occurred in a cell in Phoenix." With defendant's incarceration being necessary to the proof of being bailed out, Sutherland was not prejudiced by admitting the evidence of the location of the bank robbery discussions. United States v. Sutherland, *supra.*

In Bram v. United States, 226 F.2d 858 (8th Cir. 1955), it was held in a bank robbery prosecution that a statement by a witness that he met the defendant in a reformatory where they were "doing time" together was relevant to show the association of the two prior to the robbery and therefore was properly admitted. *See also* Andrews v. United States, 309 F.2d 127 (5th Cir. 1962).

In addition, the location of the jailhouse conversation was part of the background facts surrounding the commission of the crimes and accordingly would be admissible on that basis. Nunez v. United States, 370 F.2d 538 (5th Cir. 1967).

█ The evidence that Sutherland was in the Maricopa County Jail was properly admitted in evidence.

### IV. Bias of the Judge

The defendant contends that the trial judge, because of bias, unfairly participated in the examination of witness Charles Fortney.

Fortney, a cellmate of Kump and Sutherland, was taken to court from the Arizona State Prison to testify concerning the jailhouse discussions. Prior to his being taken to San Antonio to testify, he wrote to the trial judge strongly protesting such action. Fortney wrote that he considered the habeas corpus ad testificandum to be a legal kidnapping and that if taken to testify he would "be forced into passive resistance and should be considered from the prosecution's viewpoint as a hostile witness." When brought to court, an attorney was appointed to consult with him before and during his testimony.

█ A comparison of Fortney's testimony at the first trial with that at the second trial indicates a lack of responsiveness at the second trial. However, notwithstanding this lack of responsiveness and continuous objections of defense counsel, which together tended to bring the testimony to a standstill, dur-

ing the entire direct examination the trial court asked at most nine questions, some of which merely restated or clarified the prosecutor's questions. This is a long way from the improper judicial intrusion into the prosecution which requires reversal. Herman v. United States, 289 F.2d 362 (5th Cir. 1961).

■ Defendant contends that because of bias the court asked, or permitted, leading questions of Fortney. The government responds that most of the questions were not leading since they were not suggestive. Whether or not some of the questions were leading is unimportant under the circumstances of this case. The witness was avowedly hostile and some leading was permissible. Gill v. United States, 285 F.2d 711 (5th Cir. 1961).

■ The trial judge stated at a pretrial hearing that he had no doubt that the defendant was guilty. Defendant points to this as evidence of the court's bias. Whatever might be inferred from such a statement, isolated from the context in which it was made and the entire record of the trial, it does not suffice to show that the defendant was denied a fair trial by an impartial judge and jury. The judge had presided over the defendant's first trial. It would be naive to suppose that a trial judge who sits through an entire trial does not reach some conclusion as to guilt. Such an opinion by the court by no means indicates he cannot afford the defendant a fair and impartial trial.

The record shows that he did just that. No complaint is made of any improper or biased conduct outside of that relating to the witness Fortney. A review of the entire transcript fails to show the slightest deviation from the course of neutrality. The court was extremely patient with the defendant and permitted him to participate along with his court-appointed attorney in a number of bench conferences. During one of these conferences late in the trial, the defendant, who showed no hesitancy to speak his mind, stated that he believed from the bottom of his heart that the judge was an honorable and fair man who believed in "actual justice." The record does not show otherwise.

## V. Prejudicial Newspaper Publicity

■ Each of the four mornings during the trial a newspaper carried a story concerning the defendant's trial, mentioning the previous conviction and reversal. The court had instructed the jury not to read or view anything about the case. After the first morning, the court in chambers inquired of each juror separately whether he had read any of the articles. Each answered in the negative. The following mornings each was asked in open court if any article had been read. None had seen the stories. No objection was made then, or now, to the procedures followed by the court in this regard. Under these facts, nothing less than a rule that any publication of a prejudicial newspaper story requires a mistrial will aid the defendant. Such a *per se* rule is contrary to law. McDonald v. United States, 282 F.2d 737 (9th Cir. 1960); Palmer v. United States, 340 F.2d 48 (5th Cir. 1964).

Since there was sufficient evidence to permit the jury to find the defendant guilty on both of the counts upon which he was sentenced and the defendant has had a fair trial, the judgment of conviction is affirmed.

Affirmed.