**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John James GIDLEY and Clayton Victor Williams, Defendants-Appellants.**

No. 75–2709.

United States Court of Appeals, Fifth Circuit.

March 5, 1976.

Rehearing and Rehearing En Banc Denied April 6, 1976.

H. Gilman Hudnall, Jr., Atlanta, Ga. (Court-appointed), for defendants-appellants.

John W. Stokes, U. S. Atty., S. W. Ludwick, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before THORNBERRY, SIMPSON and MORGAN, Circuit Judges.

MORGAN, Circuit Judge:

Defendants Gidley and Williams were each convicted in the Northern District of Georgia of one count of 18 U.S.C. § 2113(d), bank robbery. Both defendants appeal and allege multitudinous errors. While we have reviewed all the defendants' contentions, we find that three allegations of error merit discussion. Defendants allege (1) that the district court erred in not suppressing evidence obtained as the product of an allegedly illegal arrest, (2) that the district court erred in not granting a continuance, and (3) that the district court erred in not suppressing in-court identifications of the defendants by certain witnesses that were allegedly the product of an impermissibly suggestive photographic display. We find the defendants' contentions to be without merit and affirm their conviction.

On March 10, 1975, in the tiny north Georgia hamlet of Hiram, a branch of the Citizens Bank of Dallas was robbed by three armed men. Not only did the masked robbers purloin approximately $3,000, but they also obtained a stack of bait money, five $10 bills whose serial

numbers had previously been recorded by the bank, and a red dye bomb that when exploded would stain the money with a red ink. As will be detailed below, ink from the dye bomb led to the arrest of defendants Gidley and Williams and their conviction.

## I. *The Arrest.*

Defendants allege that their arrest was without probable cause, and therefore, any evidence obtained as a product of their arrest should have been suppressed. *See, Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The events leading up to the arrest are as follows. At approximately 3:00 a. m. on March 11, 1975, the morning after the robbery, Detective W. A. Smith of the Atlanta Police Department received information from the manager of an Atlanta nightclub that a customer had paid the club $115 in red dye stained bills. Aware that dye stained money often is a result of the explosion of a dye bomb planted during a bank robbery, the detective had a description of the customer radioed to all units of the Atlanta Police Department. At that time, however, Detective Smith was unaware of the Hiram bank robbery. Shortly thereafter, two officers of the Atlanta Police Department spotted defendant Gidley, who fitted the radio description, with defendant Williams at a restaurant located a short distance from the nightclub. After observing Gidley pay the waitress with a red dye stained bill, the officers called for assistance, and Sergeant Fitzgerald of the Atlanta Police arrived. The Sergeant approached Gidley and asked him to come forward. As Gidley approached, Sergeant Fitzgerald noticed at Gidley's waist band a bulge that the officer thought might conceal a weapon. Fitzgerald grabbed the bulge, removed an automatic pistol, and then placed Gidley under arrest. Immediately upon the arrest of Gidley, Williams rose and yelled at the officer that the gun was his and attempted to come between the officer and Gidley. Other officers in the restaurant restrained Williams, placing him under arrest for interfering with an arrest. Both prisoners were then thoroughly searched, with dye stained money and bait money found in their possession. Defendants allege these arrests to have been made without probable cause.

■ We need not determine whether the officers observing defendants passing dye stained money is sufficient to establish probable cause for arrest. While the police officers were not aware of the particular bank robbery at Hiram, Detective Smith was aware that dye bombs are used to mark money taken in a robbery.[1] The passing of such money is an appropriate circumstance which would justify an officer investigating further possible criminal behavior. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Therefore, the police officers' limited intrusion into Gidley's liberty, by asking him to come forward and answer a few questions, was proper. *See, United States v. Rollerson*, 491 F.2d 1209, 1211–12 (5th Cir. 1974); *United States v. West*, 460 F.2d 374 (5th Cir. 1972).

■ Even though the officers were justified in questioning Gidley, the frisk was proper only if the officers were able to point to particular facts from which they might have reasonably inferred that the individual was armed. *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Tharpe*, 526 F.2d 326 (5th Cir. 1976). Here, Sergeant Fitzgerald noticed a large bulge that could well have concealed, and in fact did conceal, a

---

**1.** Defendants point out that none of the other officers testified that they were aware that the dye stained money might have come from a robbery. The radio description, however, did come from a detective in the Atlanta Robbery Division. Even making the unlikely assumption that the other officers were unaware of the significance of stained money, we believe the officers properly relied on Detective Smith's suspicions in questioning Gidley. Cf., *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Mauldin v. United States*, 328 F.2d 779 (5th Cir. 1964).

weapon. A decision not to frisk the defendant under these circumstances, in a crowded restaurant, could well have resulted in harm to the police or to bystanders. Once the officers found the weapon, they properly arrested Gidley. *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Johnson v. Wright*, 509 F.2d 828, 830 (5th Cir. 1975). Williams' interference with Gidley's arrest provided probable cause for his own arrest. *See*, Ga. Code Anno. § 26–2505 (1972). Nor does the fact that defendants were not convicted on state charges negate the probable cause that existed for their arrest. *United States v. Seay*, 432 F.2d 395, 402 (5th Cir. 1970). Finally, once the defendants were in custody, the police officers were justified in making a thorough search. *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). In short, there was nothing impermissible in the procedures used by the police in Gidley's or Williams' arrest.

## II. *The Denial of Continuance.*

Defendants' second contention is that the district court erred in denying a motion for continuance. Essentially, defendants argue that they relied on a notice of hearing, stating that the pre-trial hearing on the motions to suppress would be heard on May 27, 1975. Defendants contend that, relying on this notice, they were unprepared when the district court decided to hold the suppression hearing on May 19, and to then proceed to trial on May 20.

The granting of continuance is a matter committed to the sound discretion of the district court. *Ungar v. Sarafite*, 376 U.S. 575, 584, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *United States v. Simpson*, 460 F.2d 1321 (5th Cir. 1972). There is no evidence here that the district court applied its discretion unwisely. In fact, the record demonstrates that the defendants had no reason to be unprepared. First, subsequent to receiving the notice of hearing, defendants were notified by the district court in a letter that all parties should be ready for trial by May 19. Second, in response to defendants' claim that they had had insufficient time to obtain witnesses, the district court inquired as to what witnesses were needed. All of the witnesses named by the defense were already under subpoena by the government.[2] Third, the government's case lasted for four days during the trial, but there is no evidence that during that time defendants attempted to obtain any witnesses. Fourth, the district court after the suppression hearing instructed the attorneys that if there was any reason that they could not be prepared, they should inform the court on the morning of the trial. The following morning neither of the defendants' counsels raised any objection to proceeding with trial. Finally, both defendants had been represented for over a month by the same counsels who conducted their trial. Except for general statements by counsels that they were unprepared neither this court nor the district court was specifically informed as to the particular need for any continuance. Without such information, we can find no evidence that the district court abused its discretion. *See*, *McKinney v. Wainwright*, 488 F.2d 28 (5th Cir. 1974).

## III. *The Photographic Display.*

Defendants' third allegation of error is that the district court erred in allowing in-court identifications that were allegedly the product of an impermissibly suggestive photographic display. At trial, two brothers, David and Daniel Giddings, identified both Gidley and Williams as riding in a car leaving the scene of the robbery. David Giddings testified

---

**2.** At oral argument, defendant Gidley's attorney contended that with more time he would have been able to obtain witnesses to substantiate his client's alibi defense. Who these witnesses might be was never revealed. In fact, Gidley testified at trial that during the robbery he was with one Tojo, but this witness even though present and subpoenaed by the government was never called.

that he was in Hiram on the day of the robbery on business. At approximately 11:30 in the morning, he heard a car with squealing tires and looked up to see what was the matter. He stated that he saw a car come out of the parking lot and slide onto the highway. As the car came toward him, the inside began to fill with red smoke, apparently from the dye bomb. Both the driver and the passenger rolled down the windows and jutted their heads outside in an apparent attempt to get air. The car weaved back and forth along the street as it approached Mr. Giddings, passed him, picked up speed, and disappeared. Daniel Giddings testified that he was with his brother on the morning of the robbery and that he also saw the car come out on the highway, the smoke go off in the car, and the two men jut their heads out the window. Daniel stated that while the car was coming down the main street he heard someone yell "bank robbery," and he started toward the bank while watching the car. In his testimony, Daniel stated also, that the car passed twenty-five feet in front of him. Both witnesses identified Gidley as the driver and Williams as the passenger of the car.

In cross-examination, it was revealed that approximately two weeks before trial the FBI had shown five photographs to each Gidding brother separately. The five color photographs consisted of both front and profile shots of five men, including defendants Gidley and Williams. In the photographs, defendants Williams and Gidley have long black hair and dark complexions. Defendant Gidley also has a mustache and an unmistakable oriental appearance. Two other photographs show men who have long reddish hair and fair reddish complexions. The fifth man pictured is balding and has no mustache.

■ The standard for reviewing photographic displays was set out by the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The Court stated at p. 384, 88 S.Ct. at p. 971:

[E]ach case must be considered on its own facts and . . . convictions based on eye witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

This standard has developed into a two-prong test. First, the court must decide whether or not the photographic display was impermissibly suggestive. Second, the court must determine whether such a display created a substantial risk of misidentification at trial. *See, United States v. Allen*, 497 F.2d 160, 163 (5th Cir. 1974). Thus, even if the identification was impermissibly suggestive, the in-court identification can still be admissible. *Kelly v. Estelle*, 521 F.2d 238 (5th Cir. 1975).

■ In determining whether the photographic display was impermissibly suggestive, we evaluate only the picture spread itself—whether other more desirable methods of identification were available or whether there was a compelling need for a photographic display are not relevant in the determination. *United States v. Sutherland*, 428 F.2d 1152, 1156 (5th Cir. 1970). Having viewed the picture spread, we believe that this photographic display was impermissibly suggestive. None of the other pictures displays Gidley's oriental appearance nor do any of the men pictured except Gidley and Williams, have long black hair. The only other picture showing a person whose complexion is similar to Gidley's or Williams' is the one of a balding man. Anyone who had gotten only a glimpse of two robbers with long black hair would have found only Gidley's and Williams' pictures in this group to resemble those robbers. Secondly, while the robbery took place in March, the pictures of defendants were not shown to either of the Gidding brothers until early May. See, *United States v. Cook*, 464 F.2d 251, 253–54 (8th Cir. 1972). We find that

under the circumstances this photographic display was impermissibly suggestive.

The finding that the photographic display was improper leads to the second question, whether there was a substantial risk of misidentification at trial. The district court, relying on *United States v. Allen, supra,* found that the identification at trial was independent of any prior photographic identification.[3] We agree. In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court outlined circumstances that should be evaluated in determining if an identification was reliable even though the confrontation procedure was suggestive. The Court stated,

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* at 199, 93 S.Ct. at 382.

In applying these factors here, we find that the in-court identifications were independent of the suggestive photographic display. The two witnesses were certain of their identifications—

both when viewing the photographs and at trial. Both witnesses had ample opportunity to view the defendants during the commission of the crime. The sight of a car weaving down main street of Hiram with red smoke pouring out of it would have attracted the raptured attention of any bystander. While it is true that the car passed by the witnesses within a short time, both the driver's and the passenger's heads were well out of the car and easily within sight. A witness' identification may be independent of an impermissibly suggestive technique even if his original observation was but a fleeting glimpse.[4] *See, Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). This is not a case where a witness who was unsure of his identification was repeatedly shown the defendants or their photographs in a suggestive manner so that his identification at trial became all but inevitable. *See, Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). We find that under the circumstances of this case both in-court identifications were independent of the impermissibly suggestive photographic display.[5]

Our finding that the in-court identification need not have been excluded should not be construed to be approval of the investigative procedures used in this case. Both defendants were in cus-

---

3. While the district court's oral ruling at the conclusion of David Giddings' testimony is somewhat confusing, we read the court's statement as a finding that the in-court identification was independent of the photographic display. The transcript at page 208 states:
   > Mr. Hudnall: (defense counsel) I think that the man's testimony has been tainted by the suggestive lineup, pictured lineup, and I move to strike his testimony of the in-court identification.
   > The Court: . . . I believe the Allen case from the Fifth Circuit about a year ago, July of 1974, held that where a witness does testify he was not aided in his in-court identification by pictures previously shown to him, that that testimony is admissible, and he has so testified, and I overrule the motion.
   Considering that the district court had just reviewed *United States v. Allen, supra,* and later

   that when ruling on Daniel Giddings' testimony the court clearly applied the proper standard, we understand the statement by the district court to mean that he found David Giddings' testimony that he was not aided in his in-court identification credible.

4. The conclusion that the witnesses had ample time to view defendants is further demonstrated by the fact that another witness who had not observed the photographs identified Gidley as the driver of the automobile. *See, Government of Canal Zone v. Green C.,* 521 F.2d 241 (5th Cir. 1975); *United States v. Kopacsi,* 488 F.2d 900, 903 (5th Cir. 1973).

5. Defendants' contention that their Sixth Amendment rights were violated since their counsels were not present at the pre-trial photographic identification is without merit. *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

tody when the photographic display was shown. Generally, line-up identifications are preferable to photographic displays.[6] The government should make every effort when defendants are in custody to hold line-up identifications with the presence of counsel. *See, United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court first articulated that identification procedures have constitutional significance. In view of the serious consequences of misidentification, for the government not to make every reasonable effort to minimize gratuitously suggestive procedures is inexcusable.[7] *See, Neil v. Biggers, supra*, 409 U.S. at 188, 93 S.Ct. 375.

We have reviewed defendants' other contentions of error and find them without merit. The judgment of the district court is

Affirmed.

---

6. *See*, Grano, *Kirby, Biggers*, and *Ash*: Do Any Constitutional Safeguards Remain Against the Danger of Convicting the Innocent? 72 Mich.L.Rev. 719, 768–69 (1974).

7. *See, also*, Note 73, Colum.L.Rev. 1168 (1973).