**Peter Brian CIKORA, Petitioner,**

v.

**Louie L. WAINWRIGHT, et al.,**
**Respondents.**

**No. 85–6247–CIV.**

United States District Court,
S.D. Florida.

April 7, 1987.

Ira N. Loewy, Miami, Fla., for petitioner.

Richard G. Bartmon, Asst. Atty. Gen., West Palm Beach, Fla., for respondents.

## ORDER

MARCUS, District Judge.

THIS CAUSE has come before the Court upon the Report and Recommendation of Magistrate Peter L. Nimkoff. Petitioner Peter Brian Cikora filed a Petition for Writ of Habeas Corpus with this Court on March 18, 1985.[1] He argues first that he was deprived of his Fourteenth Amendment right to due process by an impermissibly suggestive photo-lineup combined with a substantial likelihood of misidentification under the totality of circumstances presented in the case. Petitioner argues second that his Sixth Amendment right to compulsory process and his Fourteenth Amendment right to due process were violated by the trial judge's refusal to permit him to exhibit before the jury another individual, also in jail, matching the description of the perpetrator of the crime. Magistrate Nimkoff found that the photo-lineup was "impermissibly suggestive." Nevertheless, he concluded that the "substantial likelihood of misidentification" was *cured*

---

1. At the outset, the Court would like to commend Petitioner's court-appointed counsel for taking on this assignment and for his outstanding advocacy and the vigor with which he has argued this cause.

by the direct and cross-examination of the victims at trial, and therefore that Petitioner's due process rights were not infringed. With regard to the jury view, however, the Magistrate concluded that the trial judge's ruling violated Petitioner's Fourteenth Amendment right to present relevant non-testimonial evidence. Accordingly, and on this basis, Magistrate Nimkoff recommended that the Writ of Habeas Corpus issue.

We have reviewed the entire record *de novo* and both parties' objections to the Magistrate's Report and Recommendation. For the reasons elaborated at length below, we find *first*, that the photo-lineup *neither* was impermissibly suggestive *nor* was so unreliable as to implicate the Petitioner's due process rights; *second*, that the constitutional dimensions of the jury view issue were properly advanced before the Florida appellate court and hence were exhausted in state proceedings and preserved for habeas corpus review; and *finally*, that the denial of the jury view did not violate Petitioner's rights to compulsory process or due process as secured by the Sixth and Fourteenth Amendments. Accordingly, we conclude that the Writ of Habeas Corpus may *not* issue.

## I. *Facts*

### A. *The Crime*

The instant case arises from a burglary which occurred at the Hollywood home of Janie Hernandez on August 13, 1982. (R. 33). A detailed discussion of the facts surrounding the burglary and the witnesses' various opportunities to observe the perpetrator is crucial to our determination of the constitutionality of admitting into evidence the photo identifications. Likewise, an overview of the testimony proffered and presented at trial is essential to a determination of the constitutionality of the judge's decision to prevent the jury view.

Ms. Hernandez' cousin, Karen Hudson, and her daughter, Bobbie Lynn Hudson were spending the night of August 12, 1982 with Ms. Hernandez. (R. 51–52). At approximately 10:00 p.m. that evening, Ms. Hernandez answered a knock at the door. (R. 103). She did not open the door, but looked through a blue-stained glass "jailhouse door." (R. 104). A man outside, bending over as if in pain, asked to use the phone, and Ms. Hernandez refused. (R. 103–04). During this whole incident, Ms. Hudson remained in a nearby room. (R. 53). Although she heard Ms. Hernandez speaking, she could not hear the other party. (R. 53).

At approximately 1:00 a.m. that evening, Ms. Hudson was awakened by the sounds of dogs barking. (R. 55). She, Janie, and Bobbie Lynn got up, looked around, but could not see anything suspicious. (R. 55). At approximately 2:00 a.m., Ms. Hudson went to the living room window, looked down, and saw a man on the ground on his hands and knees. (R. 56). The man had a stocking over his face, but Ms. Hudson was nevertheless able to observe that he had light brown hair, and dark eyes. (R. 57). When the man saw her looking down at him, he got up and ran. (R. 57). The police were called to the house but found nothing. (R. 57–58). Approximately one hour later, another occupant of the house saw a shadow move in the backyard. (R. 58). The police were called again, with the same result. (R. 108).

Around 6:30 a.m. the occupants of the house heard a loud noise at the front door. (R. 59). From the middle bedroom where she was, Karen Hudson looked out the window and could see the front door which was about four to five feet away. (R. 60). It was just turning daylight. (R. 59). She saw a man hitting the door trying to come in. (R. 60). She observed that he had light brown hair and an orangish-color shirt on with light sleeves, dark pants, and darker eyes. (R. 61). He did not have a stocking covering his face. (R. 61). She yelled at him and observed him through the window—about four to five feet from the door—for about five seconds before running to get Janie. (R. 61–62). As Janie then ran to hold the door, Karen called the police. (R. 62). The man soon shred the door to pieces and came through the door. (R. 62). Janie ran and hid behind the wall in the kitchen (R. 114), and Karen dropped the phone and ran down the hallway into

the back bedroom (R. 62–63). The man chased after her down the hallway and she turned around to face him. (R. 63). For a few seconds, as she faced him, he screamed at her "where's the dough?" (R. 63), before hitting her on the head with a black object. (R. 64). After he hit her, she fell to the floor and then he hit her across the face and arm. (R. 65). When Bobbie Lynn screamed at him to stop, he turned and ran out of the house. (R. 67). Ms. Hudson ran to call the police. (R. 93). As she picked up the phone she observed the intruder get into a Mercury Cougar car owned by Janie Hernandez. (R. 93). Ms. Hudson screamed and the intruder turned towards her before getting into the car. (R. 95).

During this whole incident Janie Hernandez hid in the kitchen from which she could not see any other part of the house. (R. 114). After it was all over, she ran across the street to her neighbor Bernice Terry's house (R. 114–15), from whose doorway she was able to observe the man leave the house and try to unlock her car. (R. 115). She was about 75 feet away from the man at the time and was able to observe him for "a good four minutes." (R. 116). Although she admitted that it was hard for her to see, she did state that she "saw something like him." (R. 117).

B. *Identification of the Petitioner Prior to Trial*

Deputy Cloud from the Broward County Sheriff's Office came to the Hernandez house following the incident. (R. 186). From speaking with Janie Hernandez and Karen Hudson, Deputy Cloud was able to put together a composite description of the man: a white male in his mid-twenties, approximately 5'7", 165 pounds, short to medium light brown hair, wearing a rust-colored T-shirt with a white stripe around the shoulder seam, and dark pants or blue jeans. The witnesses did not observe any facial hair, scars, marks, tatoos, or jewelry. (R. 188–9, 193, 204). Later that afternoon, after being told by an individual outside Ms. Hernandez' residence that the Petitioner, Peter Cikora, fit that description (height, weight, and hair color) and lived in the neighborhood, Deputy Cloud went to

the address that had been given him. (R. 191–92). The Petitioner was not home at the time, but when called, came right over. (R. 192). Deputy Cloud testified that the Petitioner had a full mustache which was blond or sun-bleached. (R. 193, 196). The Petitioner volunteered to go over and have the victims look at him. (R. 196). Deputy Cloud declined, however, because normal police procedure was not to do a face-to-face identification any more than an hour after the incident. (R. 198).

Deputy Sheriff Edward Baker of the Broward County Sheriff's Office then took over the investigation of the case. (R. 152–53). Detective Baker secured a photograph of the Petitioner from the Broward County Sheriff's Office. (R. 154). He put this photograph together with five others to produce a photographic lineup. (R. 7). All of the photos showed white males with similar hair, complexions and facial characteristics. Four of the photos showed men with full mustaches, one showed a man with a goatee and sparse mustache, and the photo of the Petitioner showed only a sparse mustache. Only the photo of the Petitioner, however, contained height markings.

The photographic lineup was held at the Broward County Sheriff's Office on September 13, 1982, one month after the incident. (R. 7). Janie Hernandez, Karen Hudson, and Bobbie Lynn Hudson were present. (R. 7). Officer Baker asked Janie and Bobbie Lynn to turn away while he showed the photo array to Karen Hudson. (R. 8). He then allegedly said, "These are pictures of six white males. One of them is a, believed to be the suspect. I would like you to view them and pick out who you feel is the white male that was at your residence on this particular night." (R. 9). Karen Hudson pointed to the picture of the Petitioner and then signed a form indicating her choice. (R. 9). The officer then followed the same procedure with Janie Hernandez. (R. 10). She too pointed to the picture of the Petitioner, although she indicated that she was not one hundred percent sure it was him. (R. 10). Bobbie Hudson was unable to pick out the Petition-

er. (R. 10). None of the women communicated during the selection process nor did Officer Baker indicate to any of them the other's choice. (R. 11) Prior to trial, defense counsel moved to suppress the out-of-court identification on the grounds that the pre-trial photo array was unnecessarily suggestive. Following a hearing (R. 5–31), this motion was denied by the court. (R. 31).

## C. *Testimony at Trial and the Jury View*

Ms. Hudson and Ms. Hernandez testified for the State, and based upon their observations of the suspect on the night of the crimes, positively identified the Petitioner as the man who broke into the Hernandez home, physically assaulted Hudson, and took Ms. Hernandez' car upon leaving. (R. 68, 118). Detective Baker further testified as to each woman's identifications as a result of their independent observations during the commission of the crimes. (R. 156–58).

Five witnesses testified for the defense at trial including the Defendant. John Gaetz, whose mother lived two houses away from the Hernandezes, testified that he was friendly with the Hernandezes, that he personally was quite friendly with Peter Cikora and that he was sure that he had seen Janie Hernandez when Cikora was in his company because they all knew each other. (R. 212–13). Gloria Green, John Gaetz' mother also testified that her house was on the other side of the street from the Hernandezes, two houses down, and that Peter Cikora was often at her home. (R. 242). Gloria Green, John Gaetz, Florence Jarboe, and Peggy Cikora all testified as to the differences between the way the Petitioner looked in August of 1982, and at the time the photograph was taken, which they all guessed was a considerable amount of time earlier. (R. 213–15, 224–26, 239–40, 243). Peter Cikora exhibited his tatoos on his chest, back, and arm to the jury (R. 244–45), and then testified that he had been shooting pool with Murphy Lamb until 2:30 a.m. (R. 245) on the evening of the robbery, after which he went home to Florence Jar-

boe's home where he was living at the time. (R. 248).

As part of the defendant's case, defense counsel had subpoenaed Charles P. Donorvitch (R. 173), an inmate in the Pompano Jail, whom the Petitioner had met there. (R. 176). Defense counsel argued that since Donorvitch fit the description given by the witnesses to Detective Cloud and lived in the same neighborhood, he should be brought into court for the jury to see him. (R. 171). The trial judge objected to parading him in to show the jury, although he did state that calling Donorvitch as a witness was a different matter. (R. 171–72). Mr. Donorvitch's appointed counsel expressed his client's intent to invoke his Fifth Amendment right so as not to testify. (R. 174). He also objected to bringing Donorvitch into court for a one-on-one identification as an improper show-up. (R. 175). The Assistant State Attorney objected to bringing Donorvitch into court on the grounds that he was not on the defense witness list. (R. 175, 179). The judge granted the state's motion to exclude Donorvitch on the basis of what the judge deemed to be defense counsel's inappropriate purpose in bringing Donorvitch into court and on Donorvitch's counsel's assertion that he would not testify. (R. 181). Judge Coker said, "The only purpose that you're bringing him in here is to let the jury look at him, and I think that's totally improper and his attorney objects to it and I'm not going to allow it." (R. 182).

## D. *Procedural History*

The jury found Petitioner guilty of burglary with a weapon and grand theft, as charged in the Information. (R. 339). Following his conviction, Petitioner was sentenced to concurrent prison terms of fifteen years (Count I) and five years (Count II). Petitioner appealed his conviction and sentence to the Florida Fourth District Court of Appeal. The Fourth District Court of Appeal affirmed Petitioner's conviction on May 30, 1984. *Cikora v. State*, 450 So.2d 351 (Fla. 4th DCA 1984). Petitioner filed a Petition for Writ of Habeas Corpus with this Court on March 18, 1985. On January 9, 1986, Magistrate Peter L.

Nimkoff issued his Report and Recommendation that the writ of habeas corpus issue.

## II. *Petitioner's Due Process Rights Were Not Violated by The Photographic Lineup*

A two-part test has developed for determining the constitutionality of the admission into evidence of photographic array identifications. First, the court must inquire whether the police used an impermissibly suggestive procedure in obtaining the photographic lineup identification. *Manson v. Brathwaite*, 432 U.S. 98, 107, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977); *United States v. Gidley*, 527 F.2d 1345, 1350 (5th Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). If so, the court must inquire whether under the " 'totality of the circumstances,' the identification was *reliable* even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) (emphasis added); *see also Manson*, 432 U.S. at 114, 97 S.Ct. at 2253 (concluding that *reliability* is the linchpin for determining the admissibility of identification testimony) (emphasis added).[2]

### A. *The Photographic Lineup Was Not Impermissibly Suggestive*

 Deputy Cloud's refusal to grant the Petitioner's request for a face-to-face confrontation with the victim may not be considered in determining whether the photo lineup was impermissibly suggestive. "[O]nly the picture spread itself must be evaluated in determining if it meets the standard [of impermissible suggestiveness] —whether other more desirable methods of identification ... were available, or whether there was a compelling need for speedy identification, are just not relevant to ... the impermissibly suggestive issue." *United States v. Sutherland*, 428 F.2d

1152, 1156 (5th Cir.1970), *aff'd after remand*, 463 F.2d 641 (5th Cir.), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972); *see also United States v. Gidley*, 527 F.2d 1345 (5th Cir.1976). Even if it were relevant to the suggestiveness inquiry, we do not find there to have been anything improper in Deputy Cloud's refusal of the one-on-one identification. The United States Supreme Court has noted that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967) (footnote omitted). In fact, the allowance of a one-on-one identification, has been held actually to *enhance* the suggestiveness of the identification procedure. *See Foster v. California*, 394 U.S. 440, 443, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969).

We do not, however, view either the photo array "within its four corners" or the conduct of the photographic identification procedure to have been impermissibly suggestive. The situation here is distinguishable from that presented in *United States v. Gidley*, where the defendant was the only individual pictured in the array with an oriental appearance and long black hair, and the array was deemed impermissibly suggestive. 527 F.2d 1345, 1350 (5th Cir. 1976). In the instant case, all of the pictured individuals were white males with similar hair and all exhibited some form of mustache. Although Petitioner's mustache in the photo used was sparse, Officer Baker clearly regarded it as a distinct mustache and for that reason put the photo together with others of men with mustaches. (R. 163–64). Moreover, we do not believe the presence or absence of facial hair, which distinguishes the photograph of the suspect from the others, itself renders a photographic lineup suggestive. In *United*

---

**2.** We note that the Magistrate's test of "cure," *cf.* Report and Recommendation at 2, does not apply in the context of this case. It applies rather in cases where the admissibility of an in-court identification is challenged based upon a suggestive out-of-court identification. *See United States v. Sutherland*, 428 F.2d 1152 (5th Cir.1970), *aff'd after remand*, 463 F.2d 641 (5th Cir.), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972) (where the standard is a "likelihood of *irreparable* misidentification); *Code v. Montgomery*, 725 F.2d 1316, 1320 n. 4 (11th Cir.1984), *rev'd and remanded after remand on other grounds*, 799 F.2d 1481 (11th Cir.1986).

*States v. Thurston,* for instance, the court found that although the defendant's picture was the only one among the photo display which showed a beard and braided hair, his general complexion and facial profile resembled those of the other subjects in the photospread. 771 F.2d 449, 453 (10th Cir.1985). Accordingly, it held that the photospread was not unduly suggestive.

It is not necessary that all "very similar" individuals be used in a lineup. "Participants in lineups are obviously going to differ in facial characteristics, and it would be unduly burdensome to require police officials to find five or six very similar individuals for a lineup." *United States v. Barron,* 575 F.2d 752, 755 (9th Cir.1978) (dismissing defendant's argument that the lineup was unfair because of his large nose). The crucial test of suggestiveness is not dissimilarity of subjects from the suspect or from the description of the suspect given to the police, but rather whether it can be said that the picture selected would *inevitably* have been selected whether or not the individual pictured was guilty or innocent. *See United States v. Monks,* 774 F.2d 945, 956 (9th Cir.1985) (finding that although pictures used in photo lineup were dissimilar to the defendant's and to the person shown in the bank picture, the tellers were not in any way inevitably directed to select defendant's picture).

We do not find the sparsity of Petitioner's mustache, the height markings on his picture, or Detective Baker's alleged comment that one of the pictured men was "believed to be a suspect," to have compelled the identification of the Petitioner.[3] In *Foster v. California,* the petitioner stood out from the other two men by his height and by the fact that he wore a leather jacket similar to the one worn by the robber. 394 U.S. at 443, 89 S.Ct. at 1128. It was not this factor alone, however, which compelled the Court to find undue suggestiveness in *Foster.* The

Court additionally placed much emphasis on the fact that the witness had been unable to identify the petitioner in the initial lineup and only tentatively after a one-on-one confrontation. When a final lineup was thereafter arranged in which the petitioner was the only person in the lineup who had also participated in the first lineup, the witness made a definite identification. *Id.* at 443, 89 S.Ct. at 1128. The Court found that "[t]he suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, 'This is the man.' " *Id.*

The same cannot be said in the instant case. Although Detective Baker *may* have mentioned that the suspect was among the group, he did nothing to indicate who the suspect was. The witnesses were shown the photographic display individually, as the other witnesses were turned away. No comments were made while Ms. Hudson viewed the array, or signed the sheet. Ms. Hernandez, when choosing, had no indication of whom, if anyone, Ms. Hudson had selected. Clearly the mustache differential and the height markings could not have functioned as a "red flag" since Bobbie Lynn Hudson was unable to make an identification and Ms. Hernandez was only ninety percent sure of her selection. The Petitioner's picture was not repeated in a series of arrays, nor otherwise emphasized to the witnesses. We do not think that it can be said that Petitioner's picture would inevitably have been selected. Accordingly, we find that the photo lineup was not impermissibly suggestive.

B. *Sufficient Indicia of Reliability Were Present*

Suggestiveness alone does not constitutionally require the exclusion of evidence. *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401

---

**3.** While Baker initially testified that he advised the witnesses that the "suspect" was amongst the photos to be viewed, he rejected such a possibility on cross-examination, stating that he had said no such thing to the witnesses, and that he did

not know the identity of the assailant at the time. (R. 11–12). Moreover, Karen Hudson verified that she was not told that the suspect's photo was included in the array she viewed. (R. 23, 69).

(1972). Even if we were to assume *arguendo* that the photographic lineup and identification procedure in the instant case were impermissibly suggestive, Petitioner would still have to show that under the "totality of the circumstances" the identification procedure was unreliable for habeas relief to be granted. *Id.* at 199, 93 S.Ct. at 382. It is the likelihood of misidentification, not mere suggestiveness which violates a defendant's right to due process. *Id.* at 198, 93 S.Ct. at 381. In *Neil,* the court set out five factors to be considered in evaluating the likelihood of misidentification:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382. We will address each of these "indicia of reliability" in turn. When viewed as a "totality" we find that they indicate a highly reliable identification.

### 1. *The Opportunity to View*

Karen Hudson had an opportunity to view the Petitioner on four separate occasions. Admittedly, it was dark when she first viewed him crawling on the ground beneath her window and he had a stocking over his face. However, she had three additional opportunities to view him, all of which occurred after daylight. She first observed him at the door through her window, which was about four to five feet away. He no longer wore the stocking, and she had an opportunity to look at his face for a good five seconds. Second, after he had broken in and chased her down the hallway, Hudson turned and faced him. He screamed at her for a few seconds during which time she had a good opportunity to look at his face before and as he hit her. She had a final opportunity to observe him as he turned towards her from the street before getting into Janie Hernandez' car.

Janie Hernandez saw the Petitioner through the "jailhouse window" of her door when he came to the house asking to be let in at approximately 10:00 p.m. She did not see his face at the time because he was bent down, but she did see his forehead, his brown hair, and his eyes. She had a better look at him in daylight, however, from Bernice Terry's house across the street, approximately 75 feet away. From there she was able to observe him steadfastedly for four minutes. We believe Ms. Hernandez had at least as much an opportunity to view as existed in *Gidley* where the court determined that the witnesses on the street had ample opportunity to view the defendants who were in a *moving* vehicle with red smoke pouring out. *See United States v. Gidley,* 527 F.2d 1345, 1351 (5th Cir.1976). It is therefore clear that both of the victims who picked Petitioner out of the photographic array had the opportunity to, and did in fact observe and direct their attention to Petitioner.

### 2. *The Degree of Attention*

Petitioner argues that Ms. Hudson and Hernandez were inattentive to their assailant since neither of them was a trained observer, such as a professional police officer, or had any other observation training or experience and because they were more concerned with escaping their assailant than making careful observations. We find this argument without merit. It is highly unlikely that a victim of a crime will ever have police officer training with regard to registering details of a description, nor should we require it as long as a witness demonstrates ordinary attentiveness under the circumstances. Ms. Hernandez observed the Petitioner steadily for four minutes from across the street without any fear which might cloud her perception. She had already "escaped." Ms. Hudson similarly was able to carefully view the intruder from the window before he broke in and in the street as he was leaving, without any concern for her safety. Finally, when her assailant had backed her into a corner, Ms. Hudson was forced to concentrate on his face. We do not find the two victims' failure to observe facial hair or

tatoos to be indicative of a lack of attentiveness.

### 3. *The Accuracy of the Description*

Petitioner's height, weight, and general hair color conformed to the description which Janie Hernandez and Karen Hudson gave Deputy Cloud. Petitioner argues, however, that the witness' failure to observe facial hair or tatoos renders the description inaccurate. We disagree. Karen Hudson would not have had an opportunity to see the tatoos on Petitioner's chest and back since he wore a shirt when she saw him. Additionally, the tatoo on his arm was not on the arm with which she was hit. (R. 91). Although Ms. Hernandez did see the assailant shirtless outside her door through the jailhouse window, she testified that she only saw the upper part of his face—hair, forehead, eyes—since he was bent over as if in pain. Moreover, the colored glass would have made observation of the tatoos difficult.

We find credible the explanations given for the discrepancies regarding the mustache and eye color. Hudson and Hernandez both testified that Petitioner's eyes seemed dark because of his large pupils. (R. 99, 137). Officer Cloud testified that Petitioner's mustache was highly sunbleached at the time of the crime and tended to blend into his face. (R. 200). A comparison of the identification in the case at bar to that in *United States v. Monks* is instructive on the issue of accuracy of the description. 774 F.2d 945 (9th Cir.1985). In *Monks,* the court was untroubled by certain discrepancies between the witnesses' descriptions, even though the witnesses had concentrated on the robber's face:

> Romo's testimony that she was *not sure* whether the robber had a mustache does not contradict Hinkle's testimony or the surveillance photographs indicating that the robber did have a mustache.
> When confronted with the fact that she could not discern any pock marks on Holt's face at trial despite her testimony that the robber did not have them, Hinkle explained that her use of the term "pock marks" in describing the robber

was meant to mean "pores," which she did discern on Holt's face at trial.

> Romo's failure to see acne on Holt's chin at trial does not contradict her testimony that the robber had acne scars *five months earlier.*

*Id.* at 956 n. 10. Upon a fair review of the record evidence in this case, we cannot conclude that the description given in the case at bar was inaccurate.

### 4. *Witnesses' Level of Certainty*

Petitioner concedes that Karen Hudson was certain about her identification of the Petitioner. She was completely definitive in her identification, to the point of stating that "when you see a face like [Petitioner's] you don't forget it." (R. 29). *See Neil v. Biggers,* 409 U.S. at 201, 93 S.Ct. at 382 (emphasizing reliability where the victim stated that "there was something about his face 'I don't think I could ever forget'"). While Janie Hernandez' pre-trial identification was not initially as certain as that of Hudson, she nevertheless maintained her identification of the Petitioner as the perpetrator. It is likewise significant that she identified the Petitioner at trial. *Cf. United States v. Cueto,* 611 F.2d 1056, 1064 (5th Cir.1980) (emphasizing the lack of an in-court identification to bolster the reliability of suggestive out-of-court identification).

Hernandez' more hesitant pre-trial identification certainly does not in and of itself create a likelihood of misidentification of constitutional dimension. In *Monks,* for instance, the court did not find reliability defeated where one of the witnesses could only narrow down her choice to three of the lineup pictures and was only "pretty sure" of her identification at trial. The court, however, was unbothered by this hesitancy, stating that "to the extent that her identification may have thus been weak and ambiguous, the jury was made fully aware of her uncertainty and could, accordingly, discount her identification testimony." *Id.* at 957 n. 11 (citation omitted). Since the jury in the case at bar could likewise have discounted Hernandez' testimony, we find her lesser degree of certainty of no constitutional consequence.

### 5. The Length of Time Between the Crime and the Confrontation

We do not believe that the time lapse of one month between the time of the crime and the confrontation in any way undermines the reliability of the identifications made in the instant case. In *United States v. Barron,* the court found that a time lapse of two months was not reason to find the identification unreliable. 575 F.2d 752, 755 (9th Cir.1978). In *Neil,* the court held reliable an identification made seven months after the crime where other factors assured reliability. *See Neil,* 409 U.S. at 201, 93 S.Ct. at 383. In light of the strength of the other indicia of reliability, we cannot conclude that a time lapse of one month created a likelihood of misidentification.

In sum, we find the witnesses' identifications reliable under *Neil.* There has been no due process violation. Habeas corpus relief, therefore, may not be granted on the basis of the lineup identification.

### III. Exhaustion of the Jury View Claim

■ The Supreme Court has said that 28 U.S.C. § 2254 "requires a federal habeas petitioner to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.... In addition, the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Respondents argue that the Petitioner has not met the *Anderson* standard with respect to his Sixth and Fourteenth Amendment jury view claim.[4] We disagree, since it is clear to us that Petitioner advanced the 'substance' of his constitutional claim in his brief to the Fourth District Court of Appeal. The following passage quoted directly out of the Petitioner's brief to that court squarely presents his claim that he has been denied his Sixth

and Fourteenth Amendment rights to present relevant non-testimonial evidence on his own behalf:

> Moreover, the right to present evidence in one's own defense is considered basic to our concepts of fair trial under the Sixth and Fourteenth Amendments of the United States Constitution. *Dumas v. State,* 350 So.2d 464 (Fla.1977). Although a trial judge is traditionally accorded a wide range of discretion in the admission of evidence, such discretion does not extend to exclusion of crucial, *relevant* evidence establishing a valid defense. *United States v. Riley,* 550 F.2d [233] (5th Cir.1977). Where evidence tends in any way, even indirectly, to prove a defendant's innocence, it is error to deny its admission. *Chandler v. State,* 366 So.2d [64] (Fla. 3d DCA 1978).

Appellant's Brief at 12–13.

We think that the Petitioner "sufficiently alert[ed] the state court" to the constitutional issue, which in this circuit is all that is necessary for there to be exhaustion. *Hutchins v. Wainwright,* 715 F.2d 512, 519 (11th Cir.1983), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984) (noting that "it is not required that the petitioner present book and verse on the federal constitution"); *see also Osborne v. Wainwright,* 720 F.2d 1237, 1239 (11th Cir.1983) "the preciseness of words is not necessary in presenting the issue so long as the state court has an adequate opportunity to consider a party's objection").

If *Hutchins* and *Osborne* set the minimum standards for articulation of a federal constitutional claim in state proceedings, it is then clear to us that the Petitioner's brief to the Florida appellate court falls above that minimum. Petitioner's words were precise. He specifically emphasized that the exclusion of Mr. Donorvitch's non-testimonial evidence implicated his Sixth and Fourteenth Amendment rights to present evidence in his defense. His citation to case law in support of this claim

---

**4.** Respondents concede that the first ground for relief raised in the petition, relating to the im-

permissibly suggestive photo lineup, was fully exhausted in the state courts.

was not solely to "a state-court decision predicated solely on state law." *Cf. Anderson v. Harless,* 459 U.S. at 7 n. 3, 103 S.Ct. at 278 n. 3 (holding such authority insufficient to apprise a reviewing court of a potential federal claim). *Dumas v. State,* 350 So.2d 464 (Fla.1977), the primary state court decision cited by the Petitioner, was squarely decided upon the federal constitutional ground that the Sixth Amendment and due process right to present witnesses in one's own defense outweighed a mere violation of the rule of sequestration of witnesses. *See id.* at 466. The constitutional dimensions of the jury view were therefore raised to a state court and hence, we find that the Magistrate properly determined that the issue was exhausted.

IV. *Refusal of the Jury View Was Not a Violation of Due Process*

■ Judge Coker granted the state's motion to exclude Donorvitch from a jury view based upon Donorvitch's invocation of his Fifth Amendment right against self-incrimination and upon the impropriety of "parading" Donorvitch before the jury when he would not *testify.*[5] While Respondents are correct that the state has a strong and recognizable interest in enforcing the Fifth Amendment (*see United States v. Turkish,* 623 F.2d 769, 774 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981) (compulsory process clause cannot displace a proper claim of privilege); *State v. Montgomery,* 467 So.2d 387, 395 (Fla. 3d DCA 1985) (compulsory process clause cannot supercede a witness' invocation of his Fifth Amendment right)); the Fifth Amendment is *not* implicated by the presentation of *non-testimonial* evidence such as that sought to be introduced by Petitioner in exhibiting Donorvitch. *See United States v. Wade,* 388 U.S. 218, 222,

87 S.Ct. 1926, 1929, 18 L.Ed.2d 1149 (1967) (exhibition of accused in lineup before prosecution witness does not have testimonial significance and therefore does not violate Fifth Amendment privilege against self-incrimination); *Laureano v. Harris,* 500 F.Supp. 668 (S.D.N.Y.1980) (merely showing the jury an individual with strikingly similar looks to the defendant would not have constituted testimony and could not have been barred by individual's invocation of the Fifth Amendment); *Woodsmall v. State,* 334 So.2d 320 (Fla. 1st DCA 1976) (compulsory appearance for purpose of being identified at another's trial does not incriminate the individual who appears).

Even though we determine that there has been no Fifth Amendment bar to the proffered jury view here, we need not decide on federal habeas review whether exclusion of the non-testimonial evidence was an evidentiary error. "[I]t is necessary for the district court to consider and determine the issue presented as a federal constitutional issue not a state evidentiary issue." *Osborne v. Wainwright,* 720 F.2d 1237, 1239 (11th Cir.1983). Eleventh Circuit authority is firmly established that exclusion of evidence violates fundamental fairness and will afford federal habeas relief only where the evidence excluded is 'material in the sense of a crucial, critical, highly significant factor.' " *See, e.g., Martin v. Wainwright,* 770 F.2d 918, 938 (11th Cir.1985), *modified by* 781 F.2d 185 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986); *Boykins v. Wainwright,* 737 F.2d 1539, 1544 (11th Cir.1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985) (citations omitted). We reject the notion that the Constitution requires the admission of all merely relevant evidence. *See Perry v. Rushen,* 713

---

**5.** Contrary to Respondent's contention, we find no record evidence that the trial court's ruling excluding Donorvitch was *based,* even in part, upon state procedural rules and requirements concerning discovery violations. It is of no consequence, in this regard, that the State Attorney argued to the court that Donorvitch should be excluded because the defense had not complied with the provisions of a pre-trial discovery

rule. Since the trial court's ruling was not based upon this procedural rule, we need not, as Respondents contend, engage in the kind of analysis set out in *Perry v. Rushen,* 713 F.2d 1447 (9th Cir.1983), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984), which requires the balancing of state interests in the enforcement of its rules against the importance

F.2d 1447, 1451–53 (9th Cir.1983), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).[6] The "crucial, critical, highly significant factor" test sets a higher standard than mere relevancy. Under the facts of the instant case we cannot say that a jury view of Donorvitch was "material in the sense of a crucial, critical, highly significant factor." Indeed, we doubt whether it was relevant at all.

Petitioner did not demonstrate any connection or nexus between Donorvitch and the subject burglary or grand theft. Nor did he specify the way in which Donorvitch more closely resembled the robber's description. Petitioner had met Donorvitch in the Pompano Jail, but we have no record indication of whether Donorvitch was in fact in jail at the time of the crime's commission. We cannot be sure that Donorvitch actually lived in the neighborhood of the crime scene or had looks similar to the description of the robber given to the police, for the sole source of this information was the Petitioner himself and there was no independently reliable corroboration. *See Ferreira v. Fair,* 732 F.2d 245, 248 (1st Cir.), *cert. denied,* 469 U.S. 1017, 105 S.Ct. 430, 83 L.Ed.2d 356 (1984) (holding there to be no due process violation where excluded testimony bore "none of the indicia of substantial trustworthiness that were crucial in *Chambers*"); *cf. Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). Even if Petitioner

was correct regarding Donorvitch's looks and address, a "view" would only have presented to the jury the fact that other people in the world, including people in the neighborhood of the crime scene, might fit the description which Ms. Hudson and Hernandez gave to the police.

We cannot find any evidence, let alone "substantial evidence tending to directly connect [Donorvitch] with the commission of the crime." *Perry v. Rushen,* 713 F.2d at 1451 (citation omitted). The instant case is similar to *Perry,* where the court refused to characterize excluded testimony as "critical in the constitutional balance" where it did nothing to impugn the strong identification of Perry as the assailant and in no way connected the second man with the crime. *See id.* at 1455. *Cf. United States v. Armstrong,* 621 F.2d 951 (9th Cir.1980) (evidence that another man also matching the description of the robber had used bait bills from the robbery to purchase a car the day after the crime); *Pettijohn v. Hall,* 599 F.2d 476 (1st Cir.1979) (testimony that an eyewitness had actually first chosen a photograph of someone besides the petitioner as the one who committed the subject robbery); *United States v. Robinson,* 544 F.2d 110 (2d Cir.1976), *cert. denied,* 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978) (evidence that the third man in a bank robbery resembled an individual suspected of two armed robberies that occurred in the general area within six days prior to the

of the evidence which a defendant offers in his defense.

**6.** The crux of Petitioner's jury view claim is that the proffered non-testimonial evidence was relevant and that the Compulsory Process Clause and the Due Process Clause require its admission. In support of his claim, Petitioner relies on the language in *United States v. Armstrong* that "[f]undamental standards of relevancy, subject to the discretion of the court to exclude cumulative evidence and to insure orderly presentation of a case, require the admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged." 621 F.2d 951, 953 (9th Cir. 1980) (citations omitted). Yet as the Ninth Circuit noted subsequently in *Perry v. Rushen:*

Although citing constitutional cases, *Armstrong* reviewed an application of the Federal

Rules of Evidence by the federal district court. We reversed because the district court had made an error in applying those rules. Mention was made of neither the sixth amendment nor due process. Nothing in *Armstrong* supports a belief that the Federal Rules of Evidence are constitutionally required, or that the Constitution requires admission of all relevant evidence. For the same reason the petitioner's reliance upon *United States v. Robinson* ... and *Holt v. United States* ... is misplaced.

713 F.2d at 1451 (footnote omitted). *Chambers v. Mississippi,* which Petitioner also cites in support of his jury view due process claim, hinged upon the fact that the excluded testimony was "*critical* to Chambers' defense." 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (emphasis added).

bank robbery); *Laureano v. Harris,* 500 F.Supp. 668, 672–73 (S.D.N.Y.1980) (defendant should have been able to call another man for physical comparison purposes where the second man ultimately confessed to the subject crime, his appearance was specifically shown to be strikingly similar, and other witnesses were prevented from testifying on this line of defense).

There is a final reason why we cannot regard the jury view of Donorvitch as material in the sense of a crucial, critical, highly significant factor. Petitioner presented at least five witnesses, including himself, whose primary purpose appears to have been to attack the credibility of the identifications of Petitioner made by state witnesses, in one form or another. In this respect, we think the "jury view" would merely have been cumulative evidence—in fact, not even as probative of a possible misidentification as the evidence offered by the other defense witnesses.

In sum, the jury view of Donorvitch was in no way "crucial to the jury's *accurate* resolution" of the issue of identity at trial. *See Boykins,* 737 F.2d at 1545 (emphasis added). The non-testimonial evidence was not material—in the constitutional sense— to Petitioner's defense at trial. Its exclusion thus did not violate his rights to compulsory and due process. Accordingly, we are compelled to reject the Report and Recommendation of Magistrate Nimkoff and it is hereby

ORDERED AND ADJUDGED that the Petition for Writ of Habeas Corpus be and the same is DENIED.